## IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

Chanada Robinson for herself and )
As Next Friend/Next of Kin, )
        for Anthony Thompson Jr., and )
         )
Gralyn Strong, )
         )
      Plaintiffs, )
         )
vs. )     Civil Trial No. _____
         )     JURY TRIAL REQUESTED
Knox County Board of Education, )
Knox County, )
City of Knoxville, d/b/a the Knoxville Police )
Police Department, a government entity, )
Officer Brian Baldwin, in his individual and )
      Official capacity )
Officer Stanley Cash, in his individual and )
      Official Capacity )
Officer Jonathon Clabough, in his individual and )
      Official Capacity )
Officer Adam Willson, in his individual and )
      Official Capacity. )
         )
      Defendants. )

## COMPLAINT

Plaintiffs, Chanada Robinson (hereinafter "Ms. Robinson" or "Mother"), for herself and as next of kin/next friend of Anthony Thompson, Jr., (hereinafter "Anthony") and Gralyn Strong (hereinafter "Gralyn"), by and through respective counsel, and would show this Court:

### I.    NATURE OF ACTION

1. Mother files pursuant to 42 U.S.C. 1983 for the deprivation of Anthony's civil rights guaranteed by the Fourth, Fifth and Fourteenth Amendments, and in her own right for the deprivation of her civil right to the custody and society of her son. Specifically, as

will be discussed herein, Mother alleges that her son's rights, and her rights, were violated due to the acts and omissions of the City of Knoxville, acting through the Knoxville Police Department, and of the Knox County School Board, operating Knox County Schools. Specifically, Plaintiffs allege that these entities (a) effected an unreasonable seizure of Anthony and Gralyn without probable cause or an arrest warrant, in violation of their respective Fourth, Fifth and Fourteenth Amendment rights; (b) failed to train their officers, and/or (c) engaged in a custom or practice, that resulted in the officers acting under color of state law to kill Anthony Thompson on April 12, 2021 in front of his best friend, Gralyn Strong. This deprived Anthony of his clearly established Constitutional rights under the Fourth, Fifth and Fourteenth Amendments, and Mother's clearly established Constitutional right to the care, custody and society of her son. Plaintiffs also plead related state law claims against various entities who share responsibility for the death of Anthony. Plaintiffs all request nominal and compensatory damages, expenses, costs and attorneys' fees and injunctive relief as will be discussed herein.

## II.     JURISDICTION and VENUE

2.  This court has subject matter jurisdiction to hear a 42 U.S.C. 1983 claim pursuant to 42 U.S.C. 1331 and 1343 in that Plaintiffs' claims arise out of the Constitution and present a federal question.

3.  This Court has supplemental jurisdiction over claims brought pursuant to Tennessee law under 28 U.S.C. 1367 because such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the U.S. Constitution.

4. Venue is proper in that the events that give rise to this cause of action occurred in Knox County, Tennessee.

## III.    PARTIES

### A. Plaintiffs

1. Anthony Thompson, Jr. (hereinafter "Anthony") was born on December 1, 2003 to Chanada "Dawn" Robinson and Anthony J. Thompson, Sr.  Anthony died on April 12, 2021, at age seventeen (17).  At all times material hereto, Anthony was a Knox County, Tennessee resident.  Anthony attended Austin East Magnet High School until April 12, 2021. He played Amateur Athletic Union basketball on Team Sleepy and with UT Alumnus B. Maze and ran track.  He enjoyed teasing his baby brother Aion and little sister Aniya, and was adored by his big sister, Adasha.

2. Plaintiff Chanada Robinson (hereinafter "Ms. Robinson" or "Mother") is the Mother of Anthony Thompson and his next of kin/next friend.  Ms. Robinson is a Speech Therapist employed by Knox County Schools.  She had sole legal and physical custody of Anthony and is the Mother of three other children, ages 26, 14, and 6.  She was the signatory on Anthony's Knox County Schools Emergency Card.

3. Plaintiff Gralyn Strong (hereinafter "Gralyn" is a student at Austin East Magnet High School. He is/was Anthony's best friend since the 5th grade; the two boys were inseparable. Gralyn played on the same basketball team as Anthony.  His grandmother is a retired Knox County school teacher and his aunt is an assistant principal at Farragut. Plaintiff was seventeen (17) at the time of the incident and is a citizen of Knox County, Tennessee.

### B. Defendants

4. Defendant, City of Knoxville, is a municipality organized under the laws of the State of Tennessee. It may be served through the City of Knoxville's Law Department, located at 400 Main St., Room 600, Knoxville, TN 37902. It is sued to the extent that the City failed to (a) failed to train its employees and/or (b) tolerated an unconstitutional custom or practice; and/or (c) under a theory of state-created danger, through the acts and omissions of officers of the Knoxville Police Department as will be more fully described below.

5. Defendant, Knox County Board of Education is the entity that operates all public schools in Knox County. It may be served through the City of Knoxville's Law Department, located at 400 Main St. Room 600, Knoxville, TN 37902. The Board is sued to the extent that it (a) failed to train its employees and/or agents and/or (b) tolerated an unconstitutional custom or practice; and/or (c) under a theory of state created danger, through the acts and omissions of the Principal of Austin East High School and/or other employees of the school system, as will be more fully described below.

6. Defendants, Officer Brian Baldwin, Officer Stanley Cash, Officer Jonathon Clabough, Officer Adam Willson are sued in their individual capacities to the extent that the proof shows that one or all of them acted with deliberate indifference and/or reckless disregard to the constitutional rights of the Plaintiffs, and in their official capacities as employees of the City of Knoxville. They are citizens and residents of Knox County. Officers Baldwin, Cash, Clabough, and Wilson are and were at the relevant time, employees of the Knoxville Police Department, and may be served through the City of Knoxville' Law Department, at 400 Main Street, Suite 600, Knoxville, TN 37902.

    **IV.    GENERAL ALLEGATIONS**

7. On July 17, 2019, less than two (2) years before Anthony Thompson was killed and in response to repeated incidents of violence in Knox County schools, the City of Knoxville Police Department, the Knox County Sheriff's Department, and Knox County Board of Education entered a Memorandum of Agreement (hereinafter "MOA") that, if it had been followed, likely would have saved Anthony's life.

8. The MOA is attached to this Complaint as <u>Exhibit 1</u>. It outlines certain responsibilities, policies and procedures governing the respective roles of the School Principal, the School Security Officers and law enforcement when engaging students on school campus:

> The purpose of this document is to set forth guidelines to ensure that the Knoxville Police Department, the Knox County Sheriff's Office and the school district have a shared understanding of the roles and responsibilities of each in maintaining safe schools, improving school climate, and supporting educational opportunities for all students."

MOA pg. 1.

9. The "Goals of this Memorandum of Agreement" include to

> Establish a positive working relationship in a cooperative effort to prevent and address juvenile delinquency and assist in student development and accountability…Promote positive attitudes regarding the police role in society and to inform students of their rights and responsibilities as lawful citizens…Define the fundamental guidelines to be followed regarding information sharing as it relates to a wide variety of data to include student records, electronic communication, video, DHS's referrals and threat assessments.

MOA pg. 3.

10. Pursuant to the terms of the MOA, the principal was to work with two separate police officers assigned to the school. MOA pp. 3-6.

   a. The Knox County Sheriff's Department assigned a "School Security Officer" (hereinafter "SSO") to area high schools, including Austin East High School. This officer was responsible for day-to-day safety and security of the school and was required to report on these matters to the principal. This officer was required to be present from before school began and stay until after school adjourned. S/he monitored security cameras and controlled access to the school, and s/he generally patrolled halls, bathrooms, stairwells, and other public spaces. S/he was required to

complete forty (40) hours of training called the "school resource officer training course" and additional "specialized" training. MOA pg. 6.

    b.  Additionally, Knoxville Police Department assigned a "law enforcement officer", sometimes referred to as an "SRO" or "School Resource Officer" to area high schools, including Austin East High School. The law enforcement officer was also supposed "to arrive before the start of school and stay after school" and was required to have the same training as the SSO. If that officer took enforcement action to include the arrest of a student, s/he was required to do so in the least disruptive manner possible and notify the principal as soon as possible. MOA pg. 7.

11. Additionally, the MOA anticipated circumstances where other law enforcement officials might need to come onto campus. MOA pg. 7, par. 6. In that event, Knox County School Board Policy C-210 applied and is attached to this Complaint as Exhibit 2. It provides, in relevant part, "During the school day and immediately before and after the school day all visitors will report to the school office when entering the school and log in with the school administration….The principal shall engage law enforcement officials when he or she believes the situation warrants such measures."

12. Additionally, the MOA requires principals to report to their SSO and law enforcement officers any criminal act, "other than simple assault…committed by a student on school property." MOA pg. 5, par. 7.

13. The purpose of the MOA is to "foster engagement with open, honest school climate for students," to "establish a safe and secure learning environment" and to "establish a positive working relationship in a cooperative effort to prevent and address juvenile delinquency.: MOA pg. 3, Par. C, A, and B. Why the MOA and School Board Policy were ignored on April 12 is not clear because the Defendants have failed and refused to give Mother accurate and timely information. However, upon information and belief, one or more of the following possibilities would have to be true: Either:

a.  Custom or Practice:  The School Board and the Knoxville Police Department engaged in a custom or practice of ignoring these policies when law enforcement engaged Anthony Thompson, resulting in constitutional deprivations;

b.  Failure to Train:  Knox County Schools and the Knoxville Police Department did not provide law enforcement officers and school administration with the training necessary to implement these policies, resulting in constitutional deprivations; and/or

c.  Individual liability:  The individual law enforcement officers and applicable school administration received the training, understood the policies, and intentionally and/or with reckless disregard for the constitutional rights of the Plaintiffs ignored policy and training, resulting in constitutional deprivations.

14. A chronology of the events that led to the death of Anthony Thompson follows.

15. At the beginning of the 2020-2021 school year, Anthony, aged seventeen (17), began dating a classmate named Alexus Page (hereinafter "Alexus"), also aged seventeen (17).  By all accounts, the children were in love, though the relationship was at times turbulent.

16. Meanwhile, from January 27, 2021, to March 9, 2021, a period of roughly six (6) weeks, four (4) Austin East High School Students were shot and killed: Justin Taylor, Stanley Freeman, Janaria Muhammad and Jamarion Gillette.

17. These killings, all within a few city blocks of Austin East High School and involving Austin East students, were generally traumatic for the children and families of the school.

18. In response to these killings, the City of Knoxville dramatically increased its police presence in the school neighborhood and advised the residents that they needed to "trust" the police to protect them.

19. In the weeks following the deaths of these children, at various meetings, press conferences and city-sponsored forums, numerous community members engaged city and school officials to discuss the reasons for the community's historic lack of trust in the police.  Community members voiced their concerns and suggested alternatives that would address the recent gun violence without increasing the danger of a police-involved shooting of students.  For

example, less than two weeks before Anthony was killed, community member Ray Outsey said, "I go to Austin East, and I've been to all the schools where the violence is. Can we all just be peaceful. Can we wipe away the evil? Why we killing our people? We are better than this." His mother, Felecia, founded a group called "Love is the Answer" which connects mothers who have lost children with one another. She suggested more community building activities and mental health support and trainings to develop skills to address the trauma experienced by the children and the parents. As far back as 2020, community member Imani Mfalme Shu'la suggested that the community needed less armed police presence and more mental health resources. Dr. Moira Conley spoke at City Council regarding the need for an Alternative Response Team to be called when emergency intervention was needed. Everyone agreed on the need to address causes of violence rather than simply reacting to gun violence by bringing in more police with guns, with the idea that once a violent altercation had occurred, a child would already be dead.

20. Anthony and Alexus occasionally had loud arguments at school. In response, the principal told Mother that, to de-escalate the teens' arguments, school personnel would intervene, separate them, and allow each to speak with a designated adult support person.

21. The children's conflict spilled over to their respective families. Specifically, Anthony was repeatedly subject to provocative statements by Alexus' Mother, Regina Perkins (hereinafter "Ms. Perkins") and threats of physical violence by Ms. Perkins' boyfriend. These specific threats, combined with the shootings of four (4) Austin East students near campus within the previous six (6) weeks, placed Anthony in fear for his life while at school.

22. On or about April 5, 2021, Kelvon Foster purchased a gun at Harvey's Pistol and Pawn and gave it to Anthony.

23. Anthony's Mother never knew her son had a gun until after he was dead.

24. One week later, on April 12, 2021, Anthony began the day much like any other day, complained about his homework, ate his breakfast and took an Uber to school. Mother never had contact with her son again.

25. At approximately 12:41 PM, Anthony and Alexus had an argument on school premises. A school video camera captured an image of Alexus slapping Anthony in the face but no apparent violence by Anthony against Alexus.

26. At approximately 1:11 PM, Mother received an email from Vice Principal Milani titled "Hiccup today." The email said:

> Just wanted to reach out about a small hiccup we had today around 12:45. I got a call from the 11th counselor that Anthony and his girlfriend were "getting heated." Given our plan, she walked away and I went to see if I could help. When I got to Ant he was walking away and didn't want to speak to me. He said, 'I'm good' and "this is going to make it worse." Since he was conversating with me and being respectful, I gave him his space. On my way to him, Officer Scott happened to be in the area. I did not call her, but I'm sure from his viewpoint that he thinks the officers got called again to respond to him. Please tell him this was incidental. His girlfriend has checked out of school so I'm assuming we will end today just fine. Please encourage him to speak to me in all these situations. I am only trying to help and to keep him from negative consequences.

27. This was the only communication the school had with Mother.

28. Because Alexus had gone home, Mother believed she could deal with any issues after school.

29. For the next three (3) hours, Anthony did not go to class and instead roamed the halls. If the school had communicated with Mother, she could have intervened by calling Anthony to instruct him to go to class or to come pick him up,

30. This has been a pattern of behavior by school officials and KPD experienced by the Mother and other Austin East families. Lack of communication between the school, KPD and

parents, lack of transparency, and lack of basic human respect for the families of Austin East are why the Austin East community does not trust the police.

31. At approximately 1:16 PM, Anthony began receiving inappropriate and threatening text messages with Alexus' mother. Ms. Perkins told Anthony she had called the police and accused him of putting "ur gd hands on her." She texted, 'U step foot on my property and u will go to jail period." Anthony texted "get off my phone girl" to which Ms. Perkins responded "fuck you little boy." Laughing emojis followed before Ms. Perkins texted Anthony that she was on the phone with an "Officer Carlos."

32. At 1:17 PM, security cameras captured footage of Anthony running through the halls, leaving the building to speak to someone on the telephone, then returning to the stairwell at 1:24 PM, He then left the building a second time while talking on the phone at 1:36 PM, then returned to the stairwell at 1:50 PM.

33. Absent any adult intervention, and concerned about his friend clearly experiencing distress, Gralyn followed Anthony to the stairwell to support and comfort him.

34. If the SSO or the SRO had patrolled the campus as their job description suggests they should, they would likely have encountered Anthony and Gralyn in the hall, stairwell, or parking lot, and could have told them to get to class or else asked what was wrong.

35. Alternatively, if the principal had fulfilled his obligation under the MOA, and, in particular, informed the SSO or SRO about Anthony's actions as implicating "the safety of any parties", then the SSO or SRO could have found Anthony and talked to him or implemented the de-escalation plan previously discussed by the principal with Anthony's Mother. Based on the email from the vice principal to Mother, school administration did not believe Anthony was a threat.

36. Alternatively, the SSO should have kept his principal and the SRO apprised of the issue of Anthony roaming the hall, if it pertained to safety and security, as required by the MOA, pg. 5 Par. C.1. Again, based on the behavior of the school administration, no one believed Anthony was a threat.

37. As a matter of common sense, someone who was paying attention could have called Anthony's Mother to intervene.

38. Any of these alternatives would have prevented the altercation in the bathroom that resulted in Anthony's death.

39. At approximately 1:59 PM, Ms. Perkins called 911. She told the operator that she needed a report for Juvenile Court because "we are trying to press charges." She accused Anthony of "putting hands on my daughter." She said, "Today he started to come into the principal's office where my daughter was and started beating on the door, fixing to break glass. She came out - the principal had stepped out of the office - She came out, and he kept poking her in the jaw and pulling her hair. . . He was at my house and I made him leave because he had actually choked her and threw her around the bedroom. … every time he's been very forceful with her. I've tried to talk to his mom and no one can control this kid… he is known to carry a 9 mm pistol that he has threatened her with numerous times...I've told the school he's an issue and they know he's an issue…She left and ran home…He does have a weapon. I don't know if he does drugs or not - pretty sure he smokes weed, don't know what else he may do."

40. The officer also interviewed Alexus on the front porch of her home, who appeared calm but tearful. Alexus stated, "We continue to argue…he says, you so mad now you want to

fight…You not gonna come out…He kept threatening me…I'm tired of the fights…I don't want to be scared."

41. Ms. Perkins, who was in the house at the beginning of the interview, apparently eaves dropping, came out to the porch where Officer Clabough was interviewing Alexus, and interjected, "He's known to carry a gun." Officer Clabough asked if Ms. Perkins had personally seen the gun, to which she replied, "Yes," then corrected herself to say that Alexus had seen it. The officer asked Alexus if she knew whether Anthony had seen a gun. Alexus responded, "I don't know, we have clear backpacks."

42. To Officer Clabough's question of whether he kept a gun in the glovebox of his car, Alexus said, "He doesn't have a car." At that point, Ms. Perkins interjected again to suggest that "these kids hide guns in the bushes" outside the school.

43. Officer Clabough concluded the interview by telling Alexus, "He's going to jail. Maybe we'll get him some help."

44. Anthony retreated to the bathroom at approximately 2:16 PM, where he stayed until approximately 3:11 PM, when he was confronted by the law enforcement officers who are named Defendants. All of this is recorded on school video cameras. Prior to the exchange in the bathroom, no school officers teachers or school staff or other personnel appear to have patrolled the halls; certainly no one appears to have checked on Anthony even though he was absent from class. No one called Anthony's mother to suggest that Anthony was subject to arrest by the police, or that he was suspected of having a gun.

45. On information and belief, while Anthony was in the bathroom, Anthony was texting Alexus, asking to reconcile. Ms. Perkins exchanged several texts with Anthony during this time. In one of the texts, she told him she had called the police.

46. At approximately 2:23 PM, Anthony texted Ms. Perkins to state that he did not hurt her [Alexus]. Ms. Perkins responded by sending a text with a picture of the KPD officer's car outside her home.

47. At approximately 2:51 PM, a student texted Anthony that officers were on school premises.

48. At this time, Defendants were only looking for Anthony. Defendants did not receive any information about Gralyn and Gralyn was not under suspicion for committing any crime.

49. Gralyn occupied the bathroom stall next to Anthony, listening to music while Anthony was on his phone texting, remaining available whenever Anthony wanted to talk.

50. At approximately 2:53 PM, in violation of the MOA and School Board Policy C-210, SSO Adam Willson let Lieutenant Stanley Cash and officers Brian Baldwin and Jonathan Clabough inside the school through a back door. The officers did not engage the principal, as was required by the MOA, and instead proceeded to the school security office, and then to the bathroom.

51. Upon entering the building, two of the officers commented regarding their belief that a school of Austin East's size needed more than officers.

52. One of the officers who is, on information and belief, Officer Clabough, engaged SSO Willson by asking, "Is he still here?" SSO Willson stated that he believed Anthony was still in the building because they had not seen him leave on the security cameras, but that they were still attempting to locate him. SSO Willson stated, "He wanders the halls constantly."

53. Officer Clabough asked SSO Wilson, "Does the Principal know we're here?" SSO Wilson answered, "Yeah. The vice principal for sure."

54. Officer Clabough then asked Officer Willson, "So everything that was described took place?" Officer Willson said, "yeah," and then Officer Clabough said, "That's good enough for me. We'll get your ID in and everything and then we'll roll."

55. Officer Willson, who never spoke to Alexus or Ms. Perkins, likely thought the police had arrived relative to the argument between Alexus and Anthony. Officer Clabough, who had just been told by Ms. Perkins that Anthony had attempted to beat down the door of the principal's office, break glass, and may have a gun, likely was confirming Ms. Perkins' version of events with Officer Wilson.

56. Upon arriving in the bathroom, the officers approached Anthony, who was sitting head down in a bathroom stall. SSO Willson said, "Hey Anthony, how you doin' man?" Anthony responded, "Hey."

57. SSO Willson then said, "Stand up here." Officer Baldwin said, "Stand up dog." Anthony complied and stood up.

58. Per Officer Clabough's body camera, Anthony stepped forward. Officer Willson said, twice, and quickly, "get your hands out of your pockets." Anthony then took a second step forward. At this moment, Anthony took his left arm was out of his pocket. Officer Baldwin grabbed Anthony's left arm with two hands.

59. Per Officer Clabough's body camera, SSO Wilson then reached into Anthony's pocket. Concurrently, Officer Clabough reached into Anthony's pocket. Anthony said, repeatedly "my bad, my bad, my bad" then "wait wait wait wait wait!"

60. According to Officer Clabough's camera, Anthony's gun fired at 3:12:24. The video simply does not show whether Anthony, Officer Clabough, or SSO Willson caused the gun to fire. All three hands were in the one pocket with the gun.

61. After the first shot fired, Anthony screamed, "Wait, wait, wait!" and "What are you doing?" for the next four seconds, from 3:12:22 until 3:12:28.

62. Two seconds later, at 3:12:26, Officer Clabough pointed his weapon at Anthony.

63. Four seconds after Anthony's gun fired at 3:12:28, according to Officer Clabough's body camera, Anthony's right hand came out of the pocket, empty. At that same second, Officer Clabough shot Anthony.

64. Anthony immediately fell face forward onto the floor. SSO Wilson climbed on top of Anthony to handcuff him. Officer Clabough fired his gun, hitting SSO Wilson in the leg.

65. At 3:12:32, after hearing the gun fire, Gralyn Strong came out of the bathroom stall next to the one previously occupied by Anthony. Upon seeing Anthony fall to the floor, he shouted, "God damn!"

66. Gralyn came out of the bathroom stall with his hands up and did not pose any danger to Defendants.

67. Officer Clabough had his gun drawn and displayed it at Gralyn, and he yelled at Gralyn to get on the ground.

68. Gralyn complied with Officer Clabough's commands and sat on the ground and then laid on his stomach with his hands out.

69. Gralyn saw Anthony's leg still moving. Gralyn repeatedly shouted to the Defendants, "That's my brother! Forget me! Help my brother!" "Please help him! Please!" "Please!" "What ya'll doin'!" "He's bleeding!" "Ya'll is trippin'!" "Please! Please!"

70. Officer Clabough ignored Gralyn's pleas to help his best friend and grabbed Gralyn's hands and placed him in handcuffs.

71. At no time was Gralyn suspected of committing, nor did he commit, any crimes. Gralyn did not possess any illegal substances or items and was never a suspect in Defendants' investigation. Defendants were not looking for Gralyn.

72. Office Clabough and the other Defendants had no reason to believe that Gralyn was a threat to them or was in anyway obstructing Defendants' actions.

73. Defendants complied with all of Defendants commands, and without probable cause or an arrest warrant, Defendants unlawfully and unreasonably seized Gralyn.

74. Instead of administering CPR to Anthony, Officer Clabough searched Gralyn's person.

75. Gralyn began sobbing uncontrollably while Officer Cash stood over Anthony's prone body and washed Anthony's blood from his hands in the bathroom sink.

76. No officer or any school nurse appears on the video or in the audio recording to administer any first aid or medical assistance to Anthony. Officer Willson was offered a tourniquet.

77. The MOA and the School Board Policy C-210 appear intended to manage precisely the type of tragedy that occurred at Austin East on April 12.

78. In this case, the Vice Principal and SSO Willson were involved with the de-escalation plan between Anthony and Alexus, and possessed knowledge regarding Anthony's personal history and his current mental state, *i.e.* heartbroken over the argument with his first love, as well as Anthony "roaming the halls constantly."

79. The Vice Principal was aware that Alexus had become violent and signed out of school. SSO /Willson had a duty to patrol the halls or at least watch the video cameras, which showed Anthony's whereabouts and suggested at his mental state, showed his location in the bathroom for the previous 30 minutes, and that he was accompanied by Gralyn Strong.

80. The principal or law enforcement or SSO Willson could have taken obvious steps that would have saved Anthony, for instance, calling his mother to come pick him up from school or advising law enforcement as to the best way to approach Anthony safely, perhaps by utilizing the mentor that the school had previously identified as a resource for Anthony to talk to, or the services of the Alternative Response Team or a crisis intervention trained officer. At a minimum, a plan could have been put into place to remove the other child, Gralyn Strong, from the bathroom.

81. All of these steps were either a matter of common sense, the school's intervention plan for Alexus and Anthony, the job description of the SSO and/or the SRO, the purpose of the MOA, a presumptive subject of the forty (40) hours of school officer training, the subject of School Board Policy, and the subject of the suggestions from a community that was explicitly stating their concerns about police-on-student gun violence. If any one of these policies or suggestions had been followed, Anthony would likely be alive today.

82. At approximately 3:15 PM Mother received a phone call from her daughter Adaisha Robinson (hereinafter "Adaisha"), who told her, "Something has happened at AE."

83. Mother immediately called Anthony's cellphone, but he did not answer. Then she called Jennifer Strong, the mother of Gralyn. Ms. Strong told Mother that she was watching the police walk Gralyn out of the school in handcuffs.

84. Defendants refused to let Ms. Strong see Gralyn, refused to let Gralyn leave, and refused to call his mother or allow Gralyn to call his mother. The police held Gralyn and interrogated him for four hours in handcuffs before releasing him to his mother. No criminal charges were brought against Gralyn.

85. Meanwhile, Anthony's Mother immediately called and then retrieved her sister, Judy, and went to the school. Judy questioned an officer who said that no one was hurt. Both sisters were instructed to go to the back of the school.

86. The sisters complied and questioned police at the back of the school. They asked where the children were and were told no one was left present at the school. Mother asked about Anthony but was told she could not receive any information because Ms. Robinson's last name is not the same as Anthony's last name.

87. After approximately thirty (30) minutes, an officer asked Mother if she would talk to the police at the downtown station. Mother asked why but agreed and offered to meet him there. Instead, the officer insisted that he drive, then placed Mother in the back of a squad car.

88. When Mother arrived at the police station, she was isolated from her family and interrogated by a TBI agent in a small room about Anthony's friends, where he had spent the night, whether he had a curfew, whether he always abided by that curfew, whether he was involved with a gang, whether he had ever had criminal trouble in the past, and other similarly provocative questions. Eventually, Mother stopped answering the questions and demanded to know where her son was.

89. At that point, the TBI agent excused himself and a police chaplain entered the room to tell her that her son was dead.

90. Mother then was escorted to a different room. Renee Kelly from Knox County Schools brought her a business card.

91. Neither the police nor any school official told Mother where her son's body was. Anthony's Aunt Judy was forced to call every hospital in the area until finally locating his remains on April 14th.

92. Mother has repeatedly requested to meet with various officials, but all have refused. Mother believes this is because the City "just wants Anthony to disappear."

93. A year later, the mistreatment of these families continues. Anthony's Mother still does not have her son's belongings, including his cell phone, which would have shed light on the last minutes of her son's life and the reasons for his death.

94. Only seventy-two (72) of three hundred seventy-one (371) KPD officers have completed Crisis Intervention Training.

95. Mother has paid approximately $16,000 to bury her son. This required her to take a loan, on which she is still making payments. Anthony still does not have a grave marker.

96. All of Anthony's siblings have obtained mental health services. Mother has not, because she cannot afford it, and "needs to deal with this first."

97. Anthony's mother's right to the care, custody and society of her child is a clearly established constitutional right at the time of the incident. Gralyn and Anthony's Fourth, Fifth and Fourteenth rights were also clearly established at the time of the incident.

98. Anthony's mother has suffered the most devastating emotional distress and anguish imagined by humankind.

99. Gralyn has also suffered and continues to suffer. Prior to the incident, Gralyn was a healthy young man with no medical problems.

100. Gralyn witnessed his best friend since the 5th grade, Anthony, die.

101. As a result of witnessing Defendants kill Anthony, Gralyn started to have nervous breakdowns, panic attacks around police officers, and difficulty interacting with others, which prevented him from returning to school.

102.    Gralyn started counseling or around May 5, 2021. Gralyn was diagnosed with Post Traumatic Stress Disorder and Major Depression Disorder caused witnessing his best friend since the fifth grade bleed out and die.

103.    Gralyn's medical condition was so severe that he could no longer attend school physically and had to be enrolled in a virtual school for the remainder of the school year.

104.    The emotional and psychological damage that Defendants caused Gralyn to no longer enjoy his childhood or life like he once did. Gralyn currently sees a counselor for PTSD and Major Depression Disorder.

105.    Only the plainly incompetent or someone who knew he was violating the law would have engaged in the acts and omissions described in this Complaint.

106.    All Plaintiffs' rights were violated by the acts and omissions of the Defendants.

107.    Plaintiffs have incurred legal fees, expenses and costs necessary to enforce their rights and the rights of Anthony.

### V.    CAUSES OF ACTION

108.    Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

#### A.    As to the individual liability of the involved officers

**Count 1: Officers' liability for violation of Anthony's Fourth Amendment rights.**

109.    Plaintiff Anthony had a constitutional right, pursuant to the Fourth Amendment to the United States Constitution, to be free from unlawful/unreasonable searches and seizures. As a result of the acts described herein, Anthony was subjected to an unlawful/unreasonable seizure.

110.    At no point after officer Clabough approached Anthony in the bathroom did Anthony resist arrest or otherwise do anything that would warrant the attack by Officer Clabough and the other KPD officers.

111.    On April 12, 2021, Defendant officers acted under color of state and federal law and violated Anthony's civil rights under the Fourth Amendment to be free from unlawful/unreasonable searches and seizures.

112.    Defendant officers disregarded of Anthony's civil rights was done with either actual malice or deliberate indifference to his civil rights.

113.    As direct and proximate result of the foregoing, Anthony died.

114.    Plaintiffs are entitled to nominal, punitive and compensatory damages due to Anthony's physical injuries and suffering and their ongoing psychological injuries, pain and suffering, together with costs, expenses and attorney fees pursuant to 42 U.S.C. 1988.

   **Count 2:  Gralyn's Fourth Amendment Claims for Unlawful/Unreasonable Search and Seizure Against Officer Clabough and other un-named officers.**

115.    Plaintiff Gralyn had a constitutional right, pursuant to the Fourth Amendment to the United States Constitution, to be free from unlawful/unreasonable searches and seizures. As a result of the acts described herein, Gralyn was subjected to unlawful/unreasonable searches and seizures.

116.    At no point after officer Clabough approached Gralyn in the bathroom did Gralyn resist arrest or otherwise do anything that would warrant the attack by Officer Clabough and Gralyn's subsequent arrest and search by Officer Clabough and any other as-yet-un-named officers.

117. On April 12, 2021, Defendants, specifically, Officer Clabough, acted under color of state and federal law and violated Gralyn's civil rights under the Fourth Amendment to be free from unlawful/unreasonable search and seizure.

118. Officer Clabough disregarded of Gralyn's civil rights with either actual malice or deliberate indifference to his civil rights.

119. Once Gralyn was transported to the Police Department, he was illegally held in handcuffs for four hours, isolated from his mother, without charge or probable cause, by un-known individual officers.

120. As direct and proximate result of the foregoing, Gralyn has suffered and continues to suffer extreme emotional and psychological injuries and mental anguish, along with pain and suffering and medical expenses.

121. Plaintiff is entitled to an award of compensatory and punitive damages, attorney's fees, costs, and expenses under 42 U.S.C. §1988.

**Count 3: Liability of individual officers to Gralyn for state created danger.**

122. By the acts and omissions described in this Complaint, Officers Baldwin, Cash, Clabough, and Wilson are liable to Gralyn Strong because the officers were responsible for a state created danger.

123. The officers knew or should have known of the increased risk of harmed to Gralyn due to the deaths of four (4) children in six (6) weeks prior to the incident on or around Austin East's campus from gun violence and the voiced concerns of the community pertaining to armed police interaction with Austin East students.

124. The officers increased the risk that Plaintiff Gralyn would be exposed to an act of violence by a third party, *i.e.* either Anthony Thompson or KPD officers involved in the

arrest when they failed to secure the bathroom prior to confronting Anthony and failed to remove Gralyn once Anthony was shot.

125.    Defendants' conduct, when viewed in total, shocks the conscience.

126.    As a result of these acts and omissions, Gralyn suffered and still suffers severe emotional and psychological distress and trauma after witnessing the killing of his best friend by KPD officers and their subsequent failure to render him medical attention.

127.    Gralyn is entitled to nominal, compensatory and punitive damages attorneys' fees, costs and expenses pursuant to 42 USC 1988.

**Count 4:  Liability of individual officers to Anthony, under 42 U.S.C. 1883 and 1988 due to the deliberate Indifference to Anthony's Serious Medical Need by Officers Baldwin, Cash, and Clabough.**

128.    By the acts and omissions described in this Complaint, Officers Baldwin, Cash and Clabough deprived Anthony of his rights under the Fourteenth Amendment due to their deliberate indifference to his serious medical need.  Anthony was shot but not dead, as evidenced in Officer Clabough's body camera, which shows his right leg moving while he lays face down on the floor.  No one checked a pulse or offered basic CPR.  While Gralyn begged for the officers to help his "brother," the officers did nothing except search and restrain Anthony, offer Officer Wilson a tourniquet, while Officer Cash stepped over Anthony's prone body to wash his hands of Anthony's blood.

129.    The officers were aware that Anthony had suffered critical injuries because Officer Clabough shot Anthony at close range and in the presence of all individual Defendants.

130.    Instead of attempting to provide any medical treatment, the Officers focused on restaining Anthony, even though he was clearly unconscious and handcuffed on the floor.

131.    These individual Defendants, while acting under color of law and with a sufficiently

culpable state of mind, breached their constitutional duty to Plaintiff by failing to take

reasonable measures to save his life.  As such, Defendants acted with deliberate indifference

to Anthony's serious medical needs, posing a substantial risk of serious harm/death.

132.    As a proximate result of these acts and omissions, Anthony suffered and died; his rights

under the Fifth and Fourteenth Amendment of the Constitution violated.

133.    Plaintiff Anthony Thompson is entitled to nominal, compensatory and punitive damages,

attorneys' fees, costs and expenses under 42 U.S.C. 1988, and further justify the award of

punitive damages against the individual defendants involved.

**B.  As to the liability of the City of Knoxville**

**Count 5:  City of Knoxville's liability to all Plaintiffs under 42 U.S.C.
1983 and 1988 for failure to train its officers**

134.    By the acts and omissions described in this Complaint, the City of Knoxville is liable due

to its failure to develop, promulgate, train and enforce lawful and effective policies or

guidelines for the appropriate engagement of students and use of force on school campuses.

Specifically, the City, through Police Chief Eve Thomas, was responsible for training but

failed to train the officers who appeared at Austin East with the forty (40) hours of training

required by the July 2019 MOA, and with regard to the requirements of Knox County School

Board Policy No C-210.  Whatever training the officers did receive was clearly inadequate

for the tasks that the officers were required to perform, and the inadequacy was closely

related to or was the direct and proximate cause of the injury.

135.    The failure to develop, promulgate, train and enforce these policies was deliberately

indifferent; KPD was on notice of the community's concerns regarding police involvement

with students on Austin East campus because of the community meetings that occurred in the

six weeks before Anthony's death and because of the long city-wide history of use of excessive force in the community surrounding Austin East. Furthermore or alternatively, KPD failed to train its employees to handle recurring situations similar to its interaction with Anthony and Gralyn, presenting an obvious potential for violation of their rights through the use of excessive force or the failure to properly respond to stressful situations such as when making an arrest. The City failed to train officers of the proper and safe protocols to follow upon entering a school building and/or engaging a student at school or immediately after school. The City also failed to train its officers properly on de-escalation techniques and/or how and when to deploy or request assistance from the City's Alternative Response Team.

136. This failure to train amounts to deliberate indifference to the rights of arrestees in violation of the Fourth Amendment of the Constitution.

137. If the officers had been properly trained as to the policies and procedures in place, or which should have been in place, they would not have killed Anthony Thompson; thus the lack of training was a proximate cause of Anthony's constitutional injury.

138. As a result, Anthony suffered physical injury and death, and Anthony's Mother, and Gralyn suffered substantial psychological injuries and ongoing mental pain and suffering.

139. Plaintiffs are entitled to nominal and compensatory damages, attorney's fees, costs, expenses under 42 USC 1988.

**Count 6: City of Knoxville's liability to all Plaintiffs under 42 U.S.C. 1983 for its tolerance of unconstitutional activity as a *de facto* custom or policy.**

140. By the acts and omissions described in this Complaint, the City of Knoxville is liable due to the clear and persistent pattern of the Police Department inappropriately entering Knox County schools. Specifically, the City of Knoxville (1) had actual or constructive notice of the Police Department's habit of entering the school without first engaging the principal, but

tacitly approved same, such that (2) the City's failure to act can be said to amount to an official policy of inaction with regard to how its officers interact with the schools; and (3) the Police Department's entry upon school premises and violent engagement of Anthony Thompson was the moving force causing (a) the unconstitutional deprivation of Anthony's life; (b) the unconstitutional deprivation of Mother's right to the care, custody and society of her child; and (c) the trauma experienced by Gralyn Strong by witnessing his friend's death and through his own unreasonable seizure. Such customs and practices continue to exist due to the deliberate indifference of the Police Chief.

141.    As a direct and proximate cause of the failure to train, Anthony suffered physical injury and death and all three Plaintiffs suffered and continue to suffer severe psychological trauma, injury and suffering.

142.    Plaintiffs are entitled to nominal and compensatory damages, attorney's fees, costs and expenses under 42 USC 1988.

### C. As to the liability of the Knox County

#### Count 7: Knox County Board of Education liability under 42 U.S.C. 1983 to Gralyn Strong for state-created danger

143.    By the acts and omissions described in this Complaint, Knox County is liable to Gralyn Strong because its officers were responsible for a state created danger.

144.    The Knox County Board of Education, through the Principal/Vice Principal, (a) affirmatively acted when it authorized the entry of KPD officers onto the property, such that (b) Knox County School Board increased the risk that (c) Plaintiff Gralyn would be exposed to an act of violence by a third party, *i.e.* either Anthony Thompson or KPD officers involved in the arrest.

145.    The school knew or should have known of the increased risk of harm to Gralyn due to the deaths of four (4) children in six (6) weeks prior to Anthony on or around Austin East's campus and the voiced concerns of the community pertaining to armed police interaction with Austin East students.

146.    Gralyn suffered and still suffers severe emotional and psychological distress and trauma after witnessing the killing of his best friend by KPD officers and their subsequent failure to render him medical attention.

147.    Gralyn is entitled to nominal and compensatory damages attorneys' fees, costs and expenses pursuant to 42 USC 1988.

**Count 8: Knox County Board of Education's Liability to all Plaintiffs for failure to train its employees.**

148.    By the acts and omissions described in this Complaint, the Knox County Board of Education is liable to all Plaintiffs due to its failure to develop, promulgate, train and enforce lawful and effective policies or guidelines for the appropriate engagement of students and use of force on school campuses. Specifically, the School Board, through Superintendent Bob Thomas, failed to provide school personnel adequate training with regard to their responsibilities under Knox County School Board Policy No C-210 and the MOA. The training was inadequate for the tasks that the teachers and principals were required to perform, and the inadequacy was closely related to or actually caused the injury.

149.    The failure to develop, promulgate, train and enforce these policies was deliberately indifferent; the School Board was on notice of the community's concerns regarding police involvement with students on Austin East campus because of the community meeting that occurred in the previous six weeks before Anthony's death and because of the recent history of shooting deaths at Austin East High School. Furthermore or alternatively, Knox County

School Board failed to train its employees to handle recurring situations similar to its interaction with Anthony and Gralyn, presenting an obvious potential for violation of their rights due to failure to properly respond to stressful situations such as being arrested. The School Board failed to train school personnel of the proper and safe protocols to follow upon allowing law enforcement to enter a school building and/or engaging a student at school or immediately after school. The School Board also failed to train its personnel properly on de-escalation techniques and/or how and when to deploy or request assistance from the City's Alternative Response Team.

150.    This failure to train amounts to deliberate indifference to the rights of students in violation of the Fourteenth Amendment of the Constitution.

151.    If school personnel had been properly trained as to the policies and procedures in place, or which should have been in place, they would not have allowed the officers who killed Anthony Thompson onto campus without proper notice to those with knowledge of Anthony's where-abouts, mental status, and recent history; thus the lack of training was a proximate cause of Anthony's constitutional injury.

152.    As a result, Anthony suffered physical injury and death, and Anthony's Mother, and Gralyn suffered substantial psychological injuries and ongoing mental pain and suffering. Mother has also been deprived of her constitutional right to the care, custody and society of her son.

153.    Plaintiffs are entitled to nominal and compensatory damages, attorney's fees, costs, expenses under 42 USC 1988.

**Count 9: City of Knoxville's liability for tolerating unconstitutional conduct.**

154.     By the acts and omissions described in this Complaint, the City of Knoxville is liable due to having actual or constructive notice that its employee or agent, acting in his official capacity, was entering Knox County schools without engaging the principal; this practice is so common as to amount to a tacit policy of casual, unmonitored and un-advised interactions between officers and the student population;

155.     This interaction was the moving force that led to the shooting death of Anthony Thompson, depriving him of his life without due process of law and to Ms. Robinson's constitutional deprivation of her right to the care, custody and society of her child, and Gralyn Strong's emotional distress.

156.     The tacit approval of KPD's entry onto school premises without engaging the Principal led to the absence of effective communication regarding Anthony's whereabouts and mental state, and as to the actual facts of what happened at the school, i.e. that Alexus, not Anthony, was the physical aggressor; that Anthony did not "beat the door" of the Principal's office with sufficient force to "break glass," and that many of the allegations that Officer Wilson confirmed to Officer Clabough as being accurate as reported (by Ms. Perkins) were not true. Anthony had a gun because he was scared due to the threats of the Perkins family and due to the gun violence surrounding the school.  He was not violent.   Due to this misinformation, caused by the failure of the Principal to engage the officer directly, Officer Clabough and the rest of law enforcement responded with inappropriate and excessive use of force, causing Anthony's death and deprivation of his constitutional rights, and the constitutional rights of Anthony's mother and the psychological trauma and suffering of Anthony's mother and Gralyn.

157. For this suffering, the Plaintiffs are entitled to nominal and compensatory damages, expenses, costs, and attorney's fees pursuant to 42 USC 1988.

**Count 10: Knox County Board of Education's Liability for tolerating unconstitutional conduct.**

158. By the acts and omissions described in this Complaint, Knox County Board of Education is liable due to the Board having actual or constructive notice that its employee or agent, acting in his official capacity, was allowing the Knoxville Police Department into the school without engaging the principal; this practice is so common as to amount to a tacit policy of casual, unmonitored and un-advised interactions between officers and the student population; this interaction was the moving force that led to the shooting death of Anthony Thompson, depriving him of his life without due process of law and to Ms. Robinson's constitutional deprivation of her right to the care, custody and society of her child, and Gralyn Strong's emotional distress.

159. The tacit approval of KPD's entry onto school premises without engaging the Principal led to the absence of effective communication regarding Anthony's whereabouts and mental state, and as to the actual facts of what happened at the school, i.e. that Alexus, not Anthony, was the physical aggressor; that Anthony did not "beat the door" of the Principal's office with sufficient force to "break glass," and that many of the allegations that Officer Wilson confirmed to Officer Clabough as being accurate as reported (by Ms. Perkins) were not true. Anthony had a gun because he was scared due to the threats of the Perkins family, and due to the gun violence surrounding the school. He was not violent. Due to this misinformation, caused by the failure of the Principal to engage the officer directly, Officer Clabough and the rest of law enforcement responded with inappropriate and excessive use of force, causing Anthony's death and deprivation of his constitutional rights, and the constitutional rights of

Anthony's mother and the psychological trauma and suffering of Anthony's mother and Gralyn.

160.    For this suffering, the Plaintiffs are entitled to nominal and compensatory damages, expenses, costs, and attorney's fees pursuant to 42 USC 1988.

**Count 11:  Liability for Individual Defendants Baldwin, Cash, Clabough, and Wilson to Plaintiffs Anthony Thompson and against Officer Clabough as to for Assault and Battery**

161.    By the acts and omissions described in this Complaint, the individual officers involved knowingly, intentionally and with gross disregard for the rights of Plaintiff Anthony, assaulted him.

162.    Individual Defendant Clabough further knowingly, intentionally and with gross disregard for the rights of Plaintiff Gralyn, assaulted him and committed battery.

163.    As a result of this assault and battery, Plaintiff Anthony Thompson died and Plaintiff Gralyn Strong suffered physical and psychological injuries.

164.    Knoxville Police Department is responsible for the acts of its employees and agents pursuant to the doctrine of *respondeat superior* and is liable to Plaintiffs Anthony Thompson and Gralyn Strong pursuant to T.C.A. 8-8-301 *et. seq*.

**Count 12: Liability of individual officers to Gralyn for Intentional Infliction of Emotional Distress**

165.    Through the officers' outrageous conduct as described herein and above, the officers acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, Gralyn humiliation, mental anguish, and substantial and enduring emotional distress.

166.    As a direct and proximate result of the officer' actions against Graylyn, as alleged above, Plaintiff has suffered and continues to suffer damages including but not limited to significant and enduring emotional.

167. The officers' outrageous conducts towards Gralyn were malicious, willful, and wanton and caused extreme emotional distress to Gralyn. Gralyn is thus entitled to punitive damage from each officer to punish the officers and deter them and others from engaging in similar future conduct.

168. Knoxville Police Department is responsible for the acts of its employees and agents pursuant to the doctrine of *respondeat superior* and is liable to Plaintiffs Anthony Thompson and Gralyn Strong pursuant to T.C.A. 8-8-301 *et. seq.*

**Count 13: Knox County's liability for actions of its officer**

169. Pursuant to T.C.A. 8-8-302, Knox County is liable for the actions of its officer, SSO Adam Wilson, because pursuant to the MOA, Officer Wilson was acting by virtue of or under color of the office, and pursuant to his job description, had a duty to reasonably patrol the campus of Austin East High School and to keep his principal and any involved law enforcement officers apprised of any issues pertaining to safety and security.

170. Mr. Wilson failed in that duty when he allowed Anthony to roam the halls unattended for three hours, and when he allowed three armed law enforcement officers onto the premises through a back door without coordinating with the principal or abiding by School Board Policy C-210.

171. As a result, law enforcement officers entered the bathroom where Anthony without sufficient knowledge to act reasonably to both enforce the law and protect Anthony's safety, causing Anthony's death and the psychological trauma and ongoing suffering of Gralyn.

**VI. Relief Requested**

172. Wherefore, premises considered, Ms. Robinson requests the following relief.

A. For summons to issue and this Complaint to be served as provided by law.

B. Pursuant to Federal Rule of Civil Procedure 38(b), for a jury to be empaneled to try this action;

C. That upon trial of this case, for the Court to find that the Defendants have engaged in the acts and omissions described therein such that they are entitled to judgment;

D. For the Plaintiffs to be awarded such damages as will fully compensate them for all injuries caused by the acts and omissions of the Defendants, including but not limited to paying Ms. Robinson for the cost of burying Anthony;

E. To find that Plaintiffs have no adequate remedy at law to fully redress the wrongs they have suffered, and that others similarly situated have suffered and will suffer, due to the unlawful acts and omissions as described in this Complaint unless Plaintiffs are further granted relief, and specifically an Order to deter future such unconstitutional behavior. The need for such relief is critical to protect the rights of future students and families under the Constitution and laws of the United States and the State of Tennessee: Specifically, the Plaintiffs request that the Court issue an Order, requiring the City of Knoxville and Knox County to implement the following policies, to be known as Anthony's Laws:

1. For law enforcement to be prohibited from serving any warrant or making any arrest at school unless such is necessary to protect the immediate safety of those present at the school.

2. To require PARC to publish data identifying any KPD officers who have been subject to a complaint of excessive force and/or who have discharged a firearm.

3. To require KPD to provide at least forty (40) hours of training, to be agreed upon by the parties, to all KPD officers who may be called upon to enter school premises on de-escalation and crisis intervention techniques.

4. To provide at least forty (40) hours of training to all KPD officers with regard to compliance with School Board Policy C-210, and the requirements of the Memorandum of Agreement executed in July 2019, as amended by agreement of the parties or Order of this Court, and for such Memorandum to be subject to enforcement in a court of law.

5. To warn a child that they will be subject to physical force if they do not immediately comply with officer requests, before applying such force;

6. To refrain from interrogating or questioning the next of kin of a deceased child within the first 24 hours.

7. To provide the next of kin with immediate notice of where their deceased family member's body is when it has been transported from the scene of the death.

8. To provide the next of kin with any and all video and audio footage of the incident leading to their child's death at least 24 hours prior to releasing such footage publicly.

9. To notify the next of kin at least 24 hours prior to any press conference discussing the circumstances of a child's death and obtain permission from the next of kin to release the child's name and image.

F. To Order Knox County and/or Knox County Schools to:

1. To amend the July 2019 MOA to more clearly define the scope and responsibilities of school officials and law enforcement to communicate, engage one another, and protect the lives of students, consistent with the other remedies requested in this Complaint, and with state and federal law.

2. To train all SSO's and other law enforcement personnel assigned to patrol the school, and all school administrative officials with regard to School Board Policy C-210 and the July 2019 MAO, and to require them to enforce it with regard to police officers who enter school property

3. To require all SSO's and SRO's assigned to the school to learn the names and interests of the students, and to patrol the school building perimeter, bathrooms, halls and other public spaces at least three times per day and to interact with any students found in the halls, grounds or bathrooms during class, and for the officer to immediately report to the principal any threat to a person's safety caused by the child with whom the officer interacted.

4. To implement the following Alternative Response Policy, to include a requirement to employ de-escalation tactics such as creating distance, giving time and space, tactical repositioning, verbalization, etc.) if possible, for intervening with children who may be experiencing mental health difficulties or crisis:

   A. To have all children in Knox County Schools identify a trusted adult at their school, who will receive a call with a request to intervene if the child appears to be experiencing distress or behavior issues;

   B. To call the parent of a child if the child appears to be experiencing severe emotional distress or engaging in poor behavior;

   C. If the parent is unavailable, or if the circumstances are exigent, for the School Principal to first consider calling an Alternative Response Team that does not include armed officers.

   D. To call the police or KPD's co-responder model, as appropriate, only if (i) the trusted adult and/or the parent is unable to intervene OR (ii) the school principal becomes concerned that the child is an immediate physical danger to himself or another.

E. That upon calling law enforcement, the principal or vice principal is to personally inform the police of the child's last known whereabouts and any threat to himself or others that prompted the call, as well as any other pertinent information, such as disabilities that may obstruct compliance, intended to keep the child and others safe during the encounter with police.

F. That no law enforcement officer be allowed to enter school premises for the purpose of engaging a child without express personal face-to-face notice to the principal and a *bona fide* effort to notify the child's parent or guardian.

G. For the City of Knoxville and Knox County Schools to fully fund treatment for the students and families of Austin East High School to have access to mental health services to treat the trauma and grief caused by these events.

H. For compensatory, nominal and punitive damages as appropriate, court costs, discretionary costs, pre- and post-judgment interest, and reasonable attorney fees, to be paid to Ms. Robinson and Gralyn Strong.

I. For such other, further and general relief as this Court deems appropriate and/or in the public interest.

Respectfully submitted this 11th day of April, 2022.

*S/Margaret Held*
Margaret Held
TN BOPR #018033
Attorney for Chanada Robinson and
Anthony Thompson

HELD LAW FIRM
1522 Highland Avenue
Knoxville, TN 37916
Telephone (865) 637-6550
Facsimile 522-6760
Email mbheld@heldlawfirm.com

*S/Hoai Robinette*
Hoai R. Robinette
TN BOPR#036174
Attorney for Gralyn Strong

800 South Gay Street, Suite 1950
Knoxville, TN 37929-9732
Telephone (270) 304-7070
Facsimile (865) 521-7433
Email hoairobinette@gmail.com