## IN THE UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | | |
|---|---|---|
| Chanada Robinson for herself and | ) | |
| As Next Friend/Next of Kin, | ) | |
|       for Anthony Thompson Jr., and | ) | |
| | ) | |
| Gralyn Strong, | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Trial No. 3:22-cv-00125-CEA-JEM |
| | ) | JURY TRIAL REQUESTED |
| City of Knoxville, d/b/a the Knoxville Police | ) | |
|     Police Department, a government entity, | ) | |
| Officer Brian Baldwin, in his individual and | ) | |
|     Official capacity | ) | |
| Officer Stanley Cash, in his individual and | ) | |
|     Official Capacity | ) | |
| Officer Jonathon Clabough, in his individual and | ) | |
|     Official Capacity | ) | |
| Officer Adam Willson, in his individual and | ) | |
|     Official Capacity. | ) | |
| | ) | |
|     Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiffs, Chanada Robinson (hereinafter "Ms. Robinson" or "Mother"), for herself and

as next of kin/next friend of Anthony Thompson, Jr., (hereinafter "Anthony") and Gralyn Strong

(hereinafter "Gralyn"), by and through respective counsel, and would show this Court:

### I.     NATURE OF ACTION

1. Mother files pursuant to 42 U.S.C. 1983 for the deprivation of Anthony's civil rights

    guaranteed by the Fourth, Fifth and Fourteenth Amendments, and in her own right for the

    deprivation of her civil right to the custody and society of her son. Specifically, as will be

    discussed herein, Mother alleges that her son's rights, and her rights, were violated due to the

acts and omissions of the City of Knoxville, acting through the Knoxville Police Department, and of Officers Baldwin, Cash, Clabough, and Wilson, acting in both their individual and official capacities.  Specifically, Plaintiffs allege that these entities (a) effected an unreasonable seizure of Anthony and Gralyn without probable cause or an arrest warrant, in violation of their respective Fourth, Fifth and Fourteenth Amendment rights; (b) failed to train their officers, and/or (c) engaged in a custom or practice, that resulted in the officers acting under color of state law to kill Anthony Thompson on April 12, 2021 in front of his best friend, Gralyn Strong.  This deprived Anthony of his clearly established Constitutional rights under the Fourth, Fifth and Fourteenth Amendments, and Mother's clearly established Constitutional right to the care, custody and society of her son.  Plaintiffs also plead related state law claims against the various entities who share responsibility for the death of Anthony.  Plaintiffs all request nominal and compensatory damages, expenses, costs and attorneys' fees, and injunctive relief, as will be discussed herein.

## II.     JURISDICTION and VENUE

2.   This court has subject matter jurisdiction to hear a 42 U.S.C. 1983 claim pursuant to 42 U.S.C. 1331 and 1343 in that Plaintiffs' claims arise out of the Constitution and present a federal question.

3.   This Court has supplemental jurisdiction over claims brought pursuant to Tennessee law under 28 U.S.C. §1367 because such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the U.S. Constitution.

4. Venue is proper in that the events that give rise to this cause of action occurred in Knox County, Tennessee.

## A. Plaintiffs

5. Anthony Thompson, Jr. (hereinafter "Anthony") was born on December 1, 2003 to Plaintiff Chanada "Dawn" Robinson and Anthony J. Thompson, Sr. Anthony died on April 12, 2021, at age seventeen (17). At all times material hereto, Anthony was a Knox County, Tennessee resident. Anthony attended Austin East Magnet High School until April 12, 2021. He played Amateur Athletic Union basketball on Team Sleepy and with UT Alumnus B. Maze and ran track. He enjoyed teasing his baby brother Aion and little sister Aniya, and was adored by his big sister, Adasha.

6. Plaintiff Chanada Robinson (hereinafter "Ms. Robinson" or "Mother") is the Mother of Anthony Thompson and his next of kin/next friend. Ms. Robinson is a Speech Therapist employed by Knox County Schools. She had sole legal and physical custody of Anthony and is the Mother of three other children, ages 26, 14, and 6. She was the signatory on Anthony's Knox County Schools Emergency Card.

7. Plaintiff Gralyn Strong (hereinafter "Gralyn" is a student at Austin East Magnet High School. He is/was Anthony's best friend since the 5th grade; the two boys were inseparable. Gralyn played on the same basketball team as Anthony. His grandmother is a retired Knox County school teacher and his aunt is an assistant principal at Farragut. Plaintiff was seventeen (17) at the time of the incident and is a citizen of Knox County, Tennessee.

## B. Defendants

8. Defendant, City of Knoxville, is a municipality organized under the laws of the State of Tennessee. It may be served through the City of Knoxville's Law Department, located at 400

Main St., Room 600, Knoxville, TN 37902. It is sued to the extent that the City failed to (a) failed to train its employees and/or (b) tolerated an unconstitutional custom or practice; and/or (c) under a theory of state-created danger, through the acts and omissions of officers of the Knoxville Police Department as will be more fully described below.

9.  Defendants, Officer Brian Baldwin, Officer Stanley Cash, Officer Jonathon Clabough, Officer Adam Willson are sued in their individual capacities to the extent that the proof shows that one or all of them acted with deliberate indifference and/or reckless disregard to the constitutional rights of the Plaintiffs, and in their official capacities as employees of the City of Knoxville. They are citizens and residents of Knox County. Officers Baldwin, Cash, Clabough, and Wilson are and were at the relevant time, employees of the Knoxville Police Department, and may be served through the City of Knoxville' Law Department, at 400 Main Street, Suite 600, Knoxville, TN 37902.

### III. GENERAL ALLEGATIONS

10. On July 17, 2019, less than two (2) years before Anthony Thompson was killed and in response to repeated incidents of violence in Knox County schools, the City of Knoxville Police Department, the Knox County Sheriff's Department, and Knox County Board of Education entered a Memorandum of Agreement (hereinafter "MOA") that, if it had been followed, likely would have saved Anthony's life.

11. The MOA is attached to this Complaint as Exhibit 1.  It outlines certain responsibilities, policies, and procedures governing the respective roles of the School Principal, the School Security Officers and law enforcement when engaging students on school campus:

> "The purpose of this document is to set forth guidelines to ensure that the Knoxville Police Department, the Knox County Sheriff's Office and the school district have a

shared understanding of the roles and responsibilities of each in maintaining safe schools, improving school climate, and supporting educational opportunities for all students."

MOA pg. 1.

12. The "Goals of this Memorandum of Agreement" include to

Establish a positive working relationship in a cooperative effort to prevent and address juvenile delinquency and assist in student development and accountability…Promote positive attitudes regarding the police role in society and to inform students of their rights and responsibilities as lawful citizens…Define the fundamental guidelines to be followed regarding information sharing as it relates to a wide variety of data to include student records, electronic communication, video, DHS's referrals and threat assessments.

MOA pg. 3.

13. Pursuant to the terms of the MOA, the principal was to work with two (2) separate police officers assigned to the school. MOA pp. 3-6.

   a. The Knox County Sheriff's Department assigned a "School Security Officer" (hereinafter "SSO") to area high schools, including Austin East High School. This officer was responsible for day-to-day safety and security of the school and was required to report on these matters to the principal. This officer was required to be present from before school began and stay until after school adjourned. S/he monitored security cameras and controlled access to the school, and s/he generally patrolled halls, bathrooms, stairwells, and other public spaces. S/he was required to complete forty (40) hours of training called the "school resource officer training course" and additional "specialized" training. MOA pg. 6.

   b. Additionally, Knoxville Police Department assigned a "law enforcement officer", sometimes referred to as an "SRO" or "School Resource Officer" to area high schools, including Austin East High School. The law enforcement officer was also supposed "to arrive before the start of school and stay after school" and was required to have the same training as the SSO; specifically, the SRO is required to "complete the forty (40) hour school resource officer training course" "within 12 months of the assignment" and "as opportunities arise, will attend specialized training dealing with appropriate topics relating to their assignment." Finally, if that officer took enforcement action to include the arrest of a student, s/he was required to do so in the least disruptive manner possible and notify the principal as soon as possible. MOA pg. 7.

14. Additionally, the MOA anticipated circumstances where other law enforcement officials might need to come onto campus. MOA pg. 7, par. 6. In that event, Knox County School

Board Policy C-210 applied and is attached to this Complaint as <u>Exhibit 2</u>. It provides, in relevant part, "During the school day and immediately before and after the school day all visitors will report to the school office when entering the school and log in with the school administration….The principal shall engage law enforcement officials when he or she believes the situation warrants such measures."

15. Additionally, the MOA requires principals to report to their SSO and law enforcement officers any criminal act, "other than simple assault…committed by a student on school property." MOA pg. 5, par. 7.

16. The purpose of the MOA is to "foster engagement with open, honest school climate for students," to "establish a safe and secure learning environment" and to "establish a positive working relationship in a cooperative effort to prevent and address juvenile delinquency." MOA pg. 3, Par. C, A, and B. Why the MOA and School Board Policy were ignored on April 12 is not clear because the Defendants have failed and refused to give Mother accurate and timely information. However, upon information and belief, one or more of the following possibilities would have to be true: Either:

   a. <u>Custom or Practice</u>: The Knoxville Police Department engaged in a custom or practice of ignoring these policies when law enforcement engaged Anthony Thompson, resulting in constitutional deprivations;

   b. <u>Failure to Train</u>: The Knoxville Police Department did not provide law enforcement officers and school administration with the training necessary to implement these policies, resulting in constitutional deprivations; and/or

   c. <u>Individual liability</u>: The individual law enforcement officers and applicable school administration received the training, understood the policies, and intentionally and/or with reckless disregard for the constitutional rights of the Plaintiffs ignored policy and training, resulting in constitutional deprivations.

17. A chronology of the events that led to the death of Anthony Thompson follows.

18. At the beginning of the 2020-2021 school year, Anthony, aged seventeen (17), began dating a classmate named Alexus Page (hereinafter "Alexus"), also aged seventeen (17). By all accounts, the children were in love, though the relationship was at times turbulent.

19. Meanwhile, from January 27, 2021, to March 9, 2021, a period of roughly six (6) weeks, four (4) Austin East High School Students were shot and killed: Justin Taylor, Stanley Freeman, Janaria Muhammad, and Jamarion Gillette.

20. These killings, all within a few city blocks of Austin East High School and involving Austin East students, were generally traumatic for the children and families of the school.

21. In response to these killings, the City of Knoxville dramatically increased its police presence in the school neighborhood and advised the residents that they needed to "trust" the police to protect them.

22. In the weeks following the deaths of these children, at various meetings, press conferences and city-sponsored forums, numerous community members engaged city and school officials to discuss the reasons for the community's historic lack of trust in the police. Community members voiced their concerns and suggested alternatives that would address the recent gun violence without increasing the danger of a police-involved shooting of students. For example, less than two weeks before Anthony was killed, community member Ray Outsey said, "I go to Austin East, and I've been to all the schools where the violence is. Can we all just be peaceful. Can we wipe away the evil? Why we killing our people? We are better than this." His mother, Felecia, founded a group called "Love is the Answer" which connects mothers who have lost children with one another. She suggested more community building activities and mental health support and trainings to develop skills to address the trauma experienced by the children and the parents. As far back as 2020, community member

Imani Mfalme Shu'la suggested that the community needed less armed police presence and more mental health resources. Dr. Moira Conley spoke at City Council regarding the need for an Alternative Response Team to be called when emergency intervention was needed. Everyone agreed on the need to address causes of violence rather than simply reacting to gun violence by bringing in more police with guns, with the idea that once a violent altercation had occurred, a child would already be dead.

23. Anthony and Alexus occasionally had loud arguments at school. In response, the principal told Mother that, to de-escalate the teens' arguments, school personnel would intervene, separate them, and allow each to speak with a designated adult support person.

24. The children's conflict spilled over to their respective families. Specifically, Anthony was repeatedly subject to provocative statements by Alexus' Mother, Regina Perkins (hereinafter "Ms. Perkins") and threats of physical violence by Ms. Perkins' boyfriend. These specific threats, combined with the shootings of four (4) Austin East students near campus within the previous six (6) weeks, placed Anthony in fear for his life while at school.

25. Anthony's fear of Ms. Perkins' boyfriend and feeling that he needed to protect himself with a gun was public knowledge; posts regarding Anthony's fear were published on social media prior to his death.

26. On or about April 5, 2021, Kelvon Foster purchased a gun at Harvey's Pistol and Pawn and gave it to Anthony.

27. Anthony's Mother never knew her son had a gun until after he was dead.

28. On April 10, 2021, Alexus and Anthony argued regarding Alexus' impression that Anthony valued his time with his friends more than he valued time with her.

29. Two days later, on April 12, 2021, Anthony began the day much like any other day, arising at approximately 6:08 AM and texting Alexus at 7:24 AM to say, "good morning beautiful how u sleep." He complained to his mother about his homework, ate his breakfast and took an Uber to school. The Uber driver described him as "polite."

30. Mother never had contact with her son again.

31. Throughout the day, Anthony and Alexus maintained near-constant contact by text, discussing such things as whether she was going to school, the oil and water levels in her car, etc. Nothing indicates that the two were arguing or that Alexus was afraid of Anthony.

32. Sometime around second block, Alexus reported to Anthony that she was in Ms. Newcomb's office to do her work. The couple exchanged "I love you" via text. Alexus later told police that she liked to work in Principal Newcomb's office "because it is quiet" and because she and Principal Newcomb were "close."

33. While in Ms. Newcomb's office, Alexus told Anthony she was planning on leaving early. The couple then began bickering trivially and continued bickering nearly constantly until Anthony died.

34. At approximately 12:41 PM, Anthony and Alexus took their argument to the hall outside Principal Newcomb's office. Per the TBI file, Alexus stated that Anthony "put his finger into my cheek, as if to make his point. After that he walked away and he told me to find somewhere safe to be. Five to ten minutes after that, I told my principal (Mr. Maloney) I needed to go home." Alexus did not disclose to TBI any fact to allege that he assaulted her that morning.

35. Pursuant to Paragraph B(7) of the MOA, one of the principals asked SSO Scott to review the video footage of the hall area outside of Principal Newcomb's office to determine whether an assault had occurred. SSO Scott complied.

36. A school video camera captured an image of Alexus slapping Anthony in the face but no apparent violence by Anthony against Alexus.

37. When the incident happened, Principal Milani intervened. Anthony responded that Principal Milani would "make things worse" and asked him to leave him alone. In response, Principal Milani told Anthony to "walk a lap" and that they could "talk about it later." This approach is consistent with what Principal Milani and other school personnel had determined to be effective in managing Anthony when he was upset.

38. This approach was also consistent with the MOA, which states that its purpose is to "administer school discipline…in such a way as to keep students within the school setting to the greatest extent practicable."

39. SSO Scott and Principal Milani then interviewed Alexus. Alexus said nothing about any alleged assault but asked to go home. Principal Milani called Alexus's mother to obtain permission for Alexus to leave and Officer Scott escorted Alexus to her car.

40. At approximately 1:11 PM, Mother received an email from Vice Principal Milani titled "Hiccup today." The email said:

> "Just wanted to reach out about a small hiccup we had today around 12:45. I got a call from the 11th counselor that Anthony and his girlfriend were "getting heated." Given our plan, she walked away and I went to see if I could help. When I got to Ant he was walking away and didn't want to speak to me. He said, 'I'm good' and "this is going to make it worse." Since he was conversating with me and being respectful, I gave him his space. On my way to him, Officer Scott happened to be in the area. I did not call her, but I'm sure from his viewpoint that he thinks the officers got called again to respond to him. Please tell him this was incidental. His girlfriend has checked out of school so I'm assuming we will end today just fine.

Please encourage him to speak to me in all these situations. I am only trying to help and to keep him from negative consequences."

41. This email was the only communication the school had with Mother.

42. Because Alexus had gone home, Mother believed she could deal with any issues after school.

43. For the next three (3) hours, Anthony did not go to class and instead roamed the halls. If the school had communicated with Mother, she could have intervened by calling Anthony to instruct him to go to class or to come pick him up from school.

44. This has been a pattern of behavior by school officials and KPD experienced by the Mother and other Austin East families. Patterns of a lack of communication between the school, KPD and parents, lack of transparency, and lack of basic human respect for the families of Austin East are why the Austin East community does not trust the police.

45. At approximately 1:16 PM, while still engaged in a constant text exchange with Alexus, Anthony began receiving threatening text messages from Alexus' mother, Regina Perkins. Ms. Perkins told Anthony she had called the police and accused him of putting "ur gd hands on her." She texted, 'U step foot on my property and u will go to jail period." Anthony texted, "get off my phone girl" to which Ms. Perkins responded, "fuck you little boy." Laughing emojis followed before Ms. Perkins texted Anthony that she was on the phone with an "Officer Carlos."

46. One minute later, at 1:17 PM, security cameras captured footage of Anthony running through the halls, leaving the building to speak to someone on the telephone, then returning to the stairwell at 1:24 PM, He then left the building a second time while talking on the phone at 1:36 PM, then returned to the stairwell at 1:50 PM.

47. Absent any adult intervention, and concerned about his friend clearly experiencing distress, Gralyn followed Anthony to the stairwell to support and comfort him.

48. Based on the email from the vice principal to Mother, school administration did not believe Anthony was a threat.

49. The City of Knoxville through the Knoxville Police Department had constructive and actual notice of the threat to the rights of Plaintiffs because:

    a. Alexus and Anthony had been suspended during the school year for disrupting school due to their arguments.

    b. Anthony was known by multiple school officials, and in particular by Officer Wilson and Principal Milani to "roam the halls constantly."

    c. Austin East in general had been the nexus of four student deaths in the previous six weeks.

    d. Public meetings of the City Council and other municipal governments, including the School Board, had been attended by dozens of concerned people, all advocating for de-escalation of police presence, increased mental health services, and begging for concrete efforts to be made to repair the dysfunctional relationship between the community surrounding Austin East and law enforcement.

50. Further, the existence of the MOA as a vehicle to protect the Fourth Amendment rights of Knox County Schools students shows that the City of Knoxville had acknowledged they had notice of the Fourth Amendment threat to the rights of students at Austin East. The MOA's provisions for notification and cooperation between law enforcement and school administration were deliberately disregarded in the case of Anthony Thompson and in prior occasions. The MOA represents the City's attempts to address the problems in the community and school through its law enforcement.

51. City law enforcement did not follow the provisions of the MOA in dealing with the Anthony Thompson crisis.

52. The reason law enforcement and school administration did not follow the MOA either has to be because the City maintained a custom or policy of failing to train its employees about its

requirements and/or because the individuals were correctly trained but were deliberately indifferent to its requirements.

53. Specifically, pursuant to MOA pg. 5 Paragraph C(1) Officer Scott should have kept her principal and the SRO apprised if she believed Anthony was a threat to Alexus's safety or if there was a threat to student safety arising from Anthony roaming the hall. Either she did not believe Anthony was a threat or she was deliberately indifferent in her failure to act.

54. As a matter of common sense, someone who was paying attention could have called Anthony's Mother to intervene.

55. Any of these alternatives would have prevented the altercation in the bathroom that resulted in Anthony's death.

56. At approximately 1:59 PM, Ms. Perkins called 911. She told the operator that she needed a report for Juvenile Court because "we are trying to press charges." She accused Anthony of "putting hands on my daughter." She said, "Today he started to come into the principal's office where my daughter was and started beating on the door, fixing to break glass. She came out - the principal had stepped out of the office - She came out, and he kept poking her in the jaw and pulling her hair. . . He was at my house and I made him leave because he had actually choked her and threw her around the bedroom. … every time he's been very forceful with her. I've tried to talk to his mom and no one can control this kid… he is known to carry a 9 mm pistol that he has threatened her with numerous times...I've told the school he's an issue and they know he's an issue…She left and ran home…He does have a weapon. I don't know if he does drugs or not - pretty sure he smokes weed, don't know what else he may do."

57. The officer also interviewed Alexus on the front porch of her home, who appeared calm but tearful. Alexus stated, "We continue to argue…he says, you so mad now you want to fight…You not gonna come out…He kept threatening me…I'm tired of the fights…I don't want to be scared."

58. Ms. Perkins, who was in the house at the beginning of the interview, apparently eavesdropping, came out to the porch where Officer Clabough was interviewing Alexus, and interjected, "He's known to carry a gun." Officer Clabough asked if Ms. Perkins had personally seen the gun, to which she replied, "Yes," then corrected herself to say that Alexus had seen it. The officer asked Alexus if she knew whether Anthony had a gun. Alexus responded, "I don't know, we have clear backpacks."

59. To Officer Clabough's question of whether he kept a gun in the glovebox of his car, Alexus said, "He doesn't have a car." At that point, Ms. Perkins interjected again to suggest that "these kids hide guns in the bushes" outside the school.

60. Officer Clabough concluded the interview by telling Alexus, "He's going to jail. Maybe we'll get him some help."

61. After Officer Clabough left, Ms. Perkins apparently called her boyfriend, James Ketner. Mr. Ketner immediately called Anthony. The two exchanged hostile words and Anthony hung up before calling Mr. Ketner back to apologize.

62. Anthony retreated to the bathroom at approximately 2:16 PM, where he stayed until approximately 3:11 PM, when he was confronted by the law enforcement officers who are named Defendants. No one called Anthony's mother to suggest that Anthony was subject to arrest by the police, or that he was suspected of having a gun.

63. If the school had maintained appropriate security, Anthony would not have been able to bring a gun into school.

64. When the individual Defendants arrived at Austin East, they spoke with Officer Willson about Anthony's situation. At that point, no one knew Anthony had a gun.

65. On information and belief, while Anthony was in the bathroom, Anthony was texting Alexus, asking to reconcile. Ms. Perkins exchanged several texts with Anthony during this time. In one of the texts, she told him she had called the police.

66. At approximately 2:23 PM, Anthony texted Ms. Perkins to state that he did not hurt her [Alexus]. Ms. Perkins responded by sending a text with a picture of the KPD officer's car outside her home.

67. At approximately 2:51 PM, a student texted Anthony that officers were on school premises.

68. At this time, Defendants were only looking for Anthony. Defendants did not receive any information about Gralyn and Gralyn was not under suspicion for committing any crime.

69. Gralyn occupied the bathroom stall next to Anthony, listening to music while Anthony was on his phone texting, remaining available whenever Anthony wanted to talk.

70. At approximately 2:53 PM, in violation of the MOA and School Board Policy C-210, SRO Adam Willson let Lieutenant Stanley Cash and officers Brian Baldwin and Jonathan Clabough inside the school through a back door. The officers did not engage the principal, as was required by the MOA, and instead proceeded to the school security office, and then to the bathroom.

71. Upon entering the building, two of the officers commented regarding their belief that a school of Austin East's size needed more than officers.

72. One of the officers who is, on information and belief, Officer Clabough, engaged SRO Willson by asking, "Is he still here?" SRO Willson stated that he believed Anthony was still in the building because they had not seen him leave on the security cameras, but that they were still attempting to locate him. SRO Willson stated, "He wanders the halls constantly."

73. Officer Clabough asked SRO Willson, "Does the Principal know we're here?" SRO Wilson answered, "Yeah. The vice principal for sure."

74. Officer Clabough then asked SRO Willson, "So everything that was described took place?" Officer Willson said, "yeah," and then Officer Clabough said, "That's good enough for me. We'll get your ID in and everything and then we'll roll."

75. SRO Willson, who never spoke to Alexus or Ms. Perkins, believed KPD had arrived relative to the argument between Alexus and Anthony. Officer Clabough, who had just been told by Ms. Perkins that Anthony had attempted to beat down the door of the principal's office, break glass, and may have a gun, likely was confirming Ms. Perkins' version of events with SRO Willson.

76. Upon arriving in the bathroom, the officers approached Anthony, who was sitting head down in a bathroom stall. SRO Willson said, "Hey Anthony, how you doin' man?" Anthony responded, "Hey."

77. SRO Willson then said, "Stand up here." Officer Baldwin said, "Stand up dog." Anthony complied and stood up.

78. Per Officer Clabough's body camera, Anthony stepped forward. SRO Willson said, twice, and quickly, "get your hands out of your pockets." Anthony then took a second step forward. At this moment, Anthony took his left arm was out of his pocket. Officer Baldwin grabbed Anthony's left arm with two hands.

79. Anthony took another step forward. At that moment, per Officer Clabough's body camera, SRO Willson then reached into Anthony's pocket. Concurrently, Officer Clabough reached into Anthony's pocket. Anthony said, repeatedly "my bad, my bad, my bad" then "what are you doing?" and "Wait wait wait wait wait!"

80. According to Officer Clabough's camera, Anthony's gun fired at 3:12:24. The video simply does not show whether Anthony, Officer Clabough, or SRO Willson caused the gun to fire. All three hands were in the one pocket with the gun.

81. After the first shot fired, Anthony screamed, "Wait, wait, wait!" and "What are you doing?" for the next four seconds, from 3:12:22 until 3:12:28.

82. Two seconds later, at 3:12:26, Officer Clabough pointed his weapon at Anthony.

83. Four seconds after Anthony's gun fired at 3:12:28, according to Officer Clabough's body camera, Anthony's right hand came out of the pocket, empty. At that same second, Officer Clabough shot Anthony.

84. Anthony immediately fell face forward onto the floor. SRO Willson climbed on top of Anthony to handcuff him. Officer Clabough fired his gun, hitting SRO Willson in the leg.

85. At 3:12:32, after hearing the gun fire, Gralyn came out of the bathroom stall next to the one previously occupied by Anthony. Upon seeing Anthony fall to the floor, he shouted, "God damn!"

86. Gralyn came out of the bathroom stall with his hands up and did not pose any danger to Defendants.

87. Officer Clabough had his gun drawn and displayed it at Gralyn, and he yelled at Gralyn to get on the ground.

88. Gralyn complied with Officer Clabough's commands and sat on the ground and then laid on his stomach with his hands out.

89. At no point did Gralyn resist arrest or otherwise do anything that would warrant the attack by Officer Clabough and Gralyn's subsequent arrest and search by Officer Clabough and any other as-yet-un-named officers.

90. Gralyn saw Anthony's leg still moving. Gralyn repeatedly shouted to the Defendants, "That's my brother! Forget me! Help my brother!" "Please help him! Please!" "Please!" "What ya'll doin'!" "He's bleeding!" "Ya'll is trippin'!" "Please! Please!"

91. Officer Clabough ignored Gralyn's pleas to help his best friend and grabbed Gralyn's hands and placed him in handcuffs.

92. At no time was Gralyn suspected of committing, nor did he commit, any crimes. Gralyn did not possess any illegal substances or items and was never a suspect in Defendants' investigation. Defendants were not looking for Gralyn.

93. Office Clabough and the other Defendants had no reason to believe that Gralyn was a threat to them or was in anyway obstructing Defendants' actions.

94. Plaintiffs complied with all of Defendants' commands, and without probable cause or an arrest warrant, Defendants unlawfully and unreasonably seized Gralyn.

95. Instead of administering CPR to Anthony, Officer Clabough searched Gralyn's person while Officer Cash searched and handcuffed Anthony.

96. Gralyn began sobbing uncontrollably while Officer Cash stood over Anthony's prone body and washed Anthony's blood from his hands in the bathroom sink.

97. No officer or any school nurse appears on the video or in the audio recording to administer any first aid or medical assistance to Anthony. SRO Willson was provided immediate

medical attention; he received first aid, and 911 arrived on the scene moments later to transport him to UT Hospital for appropriate medical treatment. He recovered.

98. Principal Langlois arrived on the scene and saw SRO Willson on the floor outside the bathroom. He then saw Anthony lying on the floor of the bathroom bleeding, but still apparently alive. Mr. Langlois saw Officer Clabough standing over Gralyn and Officer Cash standing over Anthony. No one was offering Anthony assistance.

99. Principal Langlois then called Renee Kelly and told her what had happened. After he hung up and returned to the scene, Principal Langlois saw that SRO Willson had been removed, presumably by medical personnel. He saw Anthony still moving and no one attending him. When he realized no one was helping Anthony, Principal Langlois called the school nurse, Sharon Wright, and issued instructions for someone to call 911.

100. More than nine minutes elapsed between the time Principal Langlois arrived and when he called Sharon Wright. Plaintiffs do not know the time between when Anthony was shot and when he received medical attention, but it was certainly longer than nine minutes.

101. Principal Milani arrived and saw Nurse Wright slapping Anthony in the face, attempting to keep him alert.

102. Gralyn watched his best friend die.

103. The MOA and the School Board Policy C-210 appear intended to manage precisely the type of tragedy that occurred at Austin East on April 12.

104. In this case, the Vice Principal and SRO Willson were involved with the de-escalation plan between Anthony and Alexus, and possessed knowledge regarding Anthony's personal history and his current mental state, *i.e.* heartbroken over the argument with his first love, as well as Anthony "roaming the halls constantly." Vice Principal Milani, in particular, knew

that when Anthony interacted with law enforcement, he got "ramped up" and that a preferred approach was to send a teacher or principal to talk to him if there was a problem.

105. The Vice Principal was aware that Alexus had become violent and signed out of school.

106. The principal or law enforcement or SRO Willson could have taken obvious steps that would have saved Anthony, for instance, calling his mother to come pick him up from school or advising law enforcement as to the best way to approach Anthony safely, perhaps by utilizing the mentor that the school had previously identified as a resource for Anthony to talk to, or the services of the Alternative Response Team or a crisis intervention trained officer.  At a minimum, a plan could have been put into place to remove the other child, Gralyn Strong, from the bathroom.

107. All of these steps were among matters of common sense, the school's intervention plan for Alexus and Anthony, the job description of the SSO and/or the SRO, the purpose of the MOA, a presumptive subject of the forty (40) hours of school officer training, the subject of School Board Policy, and the subject of the suggestions from a community that was explicitly stating their concerns about police-on-student gun violence.  If any one of these policies or suggestions had been followed, Anthony would likely be alive today.

108. The failure of SRO Willson, in particular, to act appropriately appears partly due to his lack of training as a school resource officer.

109. Specifically, the MOA requires all law enforcement officers assigned to Knox County Schools to complete 40 hours of "school resource officer" training in the first year of their assignment.

110. KPD General Order 1.10 describes the training provided to Knoxville Police Department officers.  It lists all required "specialized training" provided for KPD officers, including but

not limited to titles such as "hostage negotiator," "polygraph examiner," "k-9 officer," "driving instructor," "first aid officer" and "honor guard."

111. The General Order states that records of all training, "such as diplomas and transcripts" are to be included in the employee's personnel file.

112. General Order 1.10 does not list "school resource officer" as a training provided by the Department. Such training does not appear to exist.

113. Section I(A)(5) of General Order 1.10 requires the Training Section to forward all "appropriate original documents" such as diplomas and transcripts to the relevant officer's personnel file. Such documents appear in all four police officer's personnel files.

114. Officer Willson's personnel file includes his training records for firearms, Taser use, and multiple failed efforts to pass the police training academy exams. However, Officer Willson's record does not include any notation indicating that he has ever participated in any school resource officer training.

115. Officer Scott, as the SSO and employee of Knox County Schools, was also required to complete this training. She appears to have followed the provisions of the MOA.

116. At approximately 3:15 PM Mother received a phone call from her daughter Adaisha Robinson (hereinafter "Adaisha"), who told her, "Something has happened at AE."

117. Mother immediately called Anthony's cellphone, but he did not answer. Then she called Jennifer Strong, the mother of Gralyn. Ms. Strong told Mother that she was watching the police walk Gralyn out of the school in handcuffs.

118. Defendants refused to let Ms. Strong see Gralyn, refused to let Gralyn leave, and refused to call his mother or allow Gralyn to call his mother. The police held Gralyn and

interrogated him for four hours in handcuffs before releasing him to his mother. No criminal charges were brought against Gralyn.

119.    Meanwhile, Anthony's Mother immediately called and then retrieved her sister, Judy, and went to the school.  Judy questioned an officer who said that no one was hurt. Both sisters were instructed to go to the back of the school.

120.    The sisters complied and questioned police at the back of the school. They asked where the children were and were told no one was left present at the school. Mother asked about Anthony but was told she could not receive any information because Ms. Robinson's last name is not the same as Anthony's last name.

121.    After approximately thirty (30) minutes, an officer asked Mother if she would talk to the police at the downtown station. Mother asked why but agreed and offered to meet him there. Instead, the officer insisted that he drive, then placed Mother in the back of a squad car.

122.    When Mother arrived at the police station, she was isolated from her family and interrogated by a TBI agent in a small room about Anthony's friends, where he had spent the night, whether he had a curfew, whether he always abided by that curfew, whether he was involved with a gang, whether he had ever had criminal trouble in the past, and other similarly provocative questions.  Eventually, Mother stopped answering the questions and demanded to know where her son was.

123.    At that point, the TBI agent excused himself and a police chaplain entered the room to tell her that her son was dead.

124.    Mother then was escorted to a different room.  Renee Kelly from Knox County Schools brought her a business card.

125.    Neither the police nor any school official told Mother where her son's body was. Anthony's Aunt Judy was forced to call every hospital in the area until finally locating his remains on April 14th.

126.    Mother has repeatedly requested to meet with various municipal officials, but all have refused. Mother believes this is because the City of Knoxville "just wants Anthony to disappear."

127.    A year later, the mistreatment of these families continues. Anthony's Mother still does not have her son's belongings, including his cell phone, which would have shed light on the last minutes of her son's life and the reasons for his death.

128.    Only seventy-two (72) of three hundred seventy-one (371) KPD officers have completed Crisis Intervention Training.

129.    Mother has paid approximately $16,000 to bury her son. This required her to take a loan, on which she is still making payments. Anthony still does not have a grave marker.

130.    All of Anthony's siblings have obtained mental health services. Mother has not, because she cannot afford it, and "needs to deal with this first."

131.    Mother's right to the care, custody and society of her child is a clearly established constitutional right and was so at the time of the incident. Gralyn and Anthony's Fourth, Fifth and Fourteenth rights were also clearly established at the time of the incident.

132.    Anthony's mother has suffered the most devastating emotional distress and anguish imagined by humankind.

133.    Gralyn has also suffered and continues to suffer. Prior to the incident, Gralyn was a healthy young man with no medical problems.

134.    Gralyn witnessed his best friend since the fifth grade, Anthony, die.

135.    As a result of witnessing Defendants kill Anthony, Gralyn started to have nervous

breakdowns, panic attacks around police officers, and difficulty interacting with others,

which prevented him from returning to school.

136.    Gralyn started counseling or around May 5, 2021.  Gralyn was diagnosed with Post

Traumatic Stress Disorder and Major Depression Disorder caused witnessing his best friend

since the fifth grade bleed out and die.

137.    Gralyn's medical condition was so severe that he could no longer attend school

physically and had to be enrolled in a virtual school for the remainder of the school year.

138.    The emotional and psychological damage that Defendants caused Gralyn to no longer

enjoy his childhood or life like he once did. Gralyn currently sees a counselor for PTSD and

Major Depression Disorder.

139.    Only the plainly incompetent or someone who knew he was violating the law would have

engaged in the acts and omissions described in this Complaint.

140.    All Plaintiffs' rights were violated by the acts and omissions of the Defendants.

141.    Plaintiffs have incurred legal fees, expenses and costs necessary to enforce their rights

and Anthony's rights.

### III.    CAUSES OF ACTION

142.    Plaintiffs incorporate by reference all of the above allegations as if fully set forth herein.

#### A.  As to the individual liability of Willson, Clabough, Cash, and Baldwin.

##### Count 1:  Officers' liability for violation of Anthony and Gralyn's Fourth Amendment rights.

143.    Plaintiffs Anthony and Gralyn had a constitutional right, pursuant to the Fourth

Amendment to the United States Constitution, to be free from unlawful/unreasonable

searches and seizures. As a result of the acts described herein, Anthony was subjected to an unlawful/unreasonable seizure.

144.    On April 12, 2021, Defendant officers acted under color of state and federal law and violated Anthony's civil rights under the Fourth Amendment to be free from unlawful/unreasonable searches and seizures.

145.    At no point after any officers approached Anthony in the bathroom did Anthony resist arrest or otherwise do anything that would warrant the attack he suffered by the KPD officers.

146.    Defendant officers disregard of Anthony's civil rights was done with deliberate indifference to his civil rights.

147.    As a direct and proximate result of the foregoing, Anthony suffered and died.

148.    As a direct and proximate result of the foregoing, Gralyn and Ms. Robinson suffered ongoing psychological injuries, pain and suffering.

149.    Plaintiffs are entitled to nominal, punitive and compensatory damages due to Anthony's physical injuries and suffering and their ongoing psychological injuries, pain and suffering, together with costs, expenses and attorney fees pursuant to 42 U.S.C. 1988.


**Count 2:  Liability of individual officers to Anthony, under 42 U.S.C. 1983 and 1988 due to the deliberate Indifference to Anthony's Serious Medical Need by Officers Baldwin, Cash, and Clabough.**

150.    By the acts and omissions described in this Complaint, Officers Baldwin, Cash and Clabough deprived Anthony of his rights under the Fourteenth Amendment due to their deliberate indifference to his serious medical need.  Anthony was shot but not dead, as evidenced by footage from Officer Clabough's body camera, which shows his right leg

moving while he lays face down on the floor. No one checked a pulse or offered basic CPR. While Gralyn begged for the officers to help his "brother," the officers did nothing except search and restrain Anthony and Gralyn and administer appropriate aid to Officer Willson, while Officer Cash stepped over Anthony's prone body to wash his hands of Anthony's blood.

151.    The officers were aware that Anthony had suffered critical injuries because Officer Clabough shot Anthony at close range and in the presence of all individual Defendants.

152.    These individual Defendants, while acting under color of law and with a sufficiently culpable state of mind, breached their constitutional duty to Plaintiff by failing to take reasonable measures to save his life. As such, Defendants acted with deliberate indifference to Anthony's serious medical needs, posing a substantial risk of serious harm/death.

153.    As a proximate result of these acts and omissions, Anthony suffered and died; his rights under the Fifth and Fourteenth Amendment of the Constitution violated.

154.    Plaintiff Anthony Thompson is entitled to nominal, compensatory and punitive damages, attorneys' fees, costs and expenses under 42 U.S.C. 1988, and further justify the award of punitive damages against the individual defendants involved.


**Count 3:  Liability for Individual Defendants Baldwin, Cash, Clabough, and Wilson to Plaintiffs Anthony Thompson and against Officer Clabough for Assault and Battery.**

155.    By the acts and omissions described in this Complaint, the individual officers involved knowingly, intentionally and with gross disregard for the rights of Plaintiff Anthony, assaulted him.

156.    Individual Defendant Clabough further knowingly, intentionally and with gross disregard for the rights of Plaintiff Gralyn, assaulted him and committed battery.

157.    As a result of this assault and battery, Plaintiff Anthony Thompson died; Plaintiff Gralyn Strong suffered physical and psychological injuries, and Plaintiff Robinson suffered and continues to suffer psychological injuries.

158.    Knoxville Police Department is responsible for the acts of its employees and agents pursuant to the doctrine of *respondeat superior* and is liable to Plaintiffs Anthony Thompson and Gralyn Strong pursuant to T.C.A. 8-8-301 *et. seq*.


**Count 4: Liability of individual officers for Intentional Infliction of Emotional Distress to all Plaintiffs.**

159.    Through the officers' outrageous conduct as described herein and above, the officers acted with a discriminatory intent to cause, or with a reckless disregard for the probability to cause, Gralyn humiliation, mental anguish, and substantial and enduring emotional distress.

160.    As a direct and proximate result of the officer' actions against Plaintiffs, as alleged above, Plaintiffs have suffered and continues to suffer damages including but not limited to significant and enduring emotional distress.

161.    The officers' outrageous conducts towards Plaintiffs were willful and wanton and caused extreme emotional distress to all Plaintiffs. They are thus entitled to punitive damage from each officer to punish the officers and deter them and others from engaging in similar future conduct.

162.    Knoxville Police Department is responsible for the acts of its employees and agents pursuant to the doctrine of *respondeat superior* and is liable to Plaintiffs pursuant to T.C.A. 8-8-301 *et. seq*.

### B. As to the liability of the City of Knoxville

**Count 5: City of Knoxville's liability to all Plaintiffs under 42 U.S.C. 1983 for its tolerance of unconstitutional activity as a *de facto* custom or policy (failure to train).**

163.    By the acts and omissions described in this Complaint, the City of Knoxville is liable due to the clear and persistent pattern of the Police Department inappropriately entering Knox County Schools.  Specifically, the City of Knoxville had actual or constructive notice of the controversy surrounding police interaction with students, and especially interactions in the Austin East Community, evidenced further by the City's efforts to address the issue by promulgating the MOA.  The City was responsible for training but failed to train the officers who appeared at Austin East with the forty (40) hours of training required by the July 2019 MOA, and with regard to the requirements of Knox County School Board Policy No C-210. The City failed to provide any "resource officer" training at all to anyone.  Whatever training the officers did receive was clearly inadequate for the tasks that the officers were required to perform.

164.    Furthermore, or alternatively, KPD failed to train its employees to handle recurring situations similar to its interaction with Anthony and Gralyn, presenting an obvious potential for violation of their constitutional rights through the use of excessive force or the failure to properly respond to stressful situations such as when making an arrest.   The City failed to train officers of the proper and safe protocols to follow upon entering a school building and/or engaging a student at school or immediately after school.  The City also failed to train its officers properly on de-escalation techniques and/or how and when to deploy or request assistance from the City's Alternative Response Team.

165. This failure to train amounts to deliberate indifference to the rights of arrestees in violation of the Fourth Amendment of the Constitution.

166. The inadequacy was closely related to or was the direct and proximate cause of the injury. The Police Department's entry upon school premises and violent engagement of Anthony Thompson was the moving force causing (a) the unconstitutional deprivation of Anthony's life; (b) the unconstitutional deprivation of Mother's right to the care, custody and society of her child; and (c) the trauma experienced by Gralyn by witnessing his friend's death and through his own unreasonable seizure.

167. As a direct and proximate cause of the failure to train, Anthony suffered physical injury and death and the remaining Plaintiffs suffered and continue to suffer severe psychological trauma.

168. If the officers had been properly trained as to the policies and procedures in place, or which should have been in place, they would not have killed Anthony Thompson; thus, the lack of training was a proximate cause of Plaintiffs' constitutional injur**ies**.

169. Plaintiffs are entitled to nominal and compensatory damages, attorney's fees, costs, expenses under 42 USC 1988.


### IV. Relief Requested

170. Wherefore, premises considered, Ms. Robinson requests the following relief.

   A. For summons to issue and this Complaint to be served as provided by law.

   B. Pursuant to Federal Rule of Civil Procedure 38(b), for a jury to be empaneled to try this action;

   C. That upon trial of this case, for the Court to find that the Defendants have engaged in the acts and omissions described therein such that they are entitled to judgment;

D. For the Plaintiffs to be awarded such damages as will fully compensate them for all injuries caused by the acts and omissions of the Defendants, including but not limited to paying Ms. Robinson for the cost of burying Anthony;

E. To find that Plaintiffs have no adequate remedy at law to fully redress the wrongs they have suffered, and that others similarly situated have suffered and will suffer, due to the unlawful acts and omissions as described in this Complaint unless Plaintiffs are further granted relief, and specifically an Order to deter future such unconstitutional behavior. The need for such relief is critical to protect the rights of future students and families under the Constitution and laws of the United States and the State of Tennessee: Specifically, the Plaintiffs request that the Court issue an Order, requiring the City of Knoxville to implement the following policies, to be known as Anthony's Laws:

1. For law enforcement to be prohibited from serving any warrant or making any arrest at school unless such is necessary to protect the immediate safety of those present at the school.

2. To require PARC to publish data identifying any KPD officers who have been subject to a complaint of excessive force and/or who have discharged a firearm.

3. To require KPD to provide at least forty (40) hours of training, to be agreed upon by the parties, to all KPD officers who may be called upon to enter school premises on de-escalation and crisis intervention techniques.

4. To provide at least forty (40) hours of training to all KPD officers with regard to compliance with School Board Policy C-210, and the requirements of the Memorandum of Agreement executed in July 2019, as amended by agreement of the parties or Order of this Court, and for such Memorandum to be subject to enforcement in a court of law.

5. To warn a child that they will be subject to physical force if they do not immediately comply with officer requests, before applying such force;

6. To refrain from interrogating or questioning the next of kin of a deceased child within the first 24 hours.

7. To provide the next of kin with immediate notice of where their deceased family member's body is when it has been transported from the scene of the death.

8. To provide the next of kin with any and all video and audio footage of the incident leading to their child's death at least 24 hours prior to releasing such footage publicly.

9. To notify the next of kin at least 24 hours prior to any press conference discussing the circumstances of a child's death and obtain permission from the next of kin to release the child's name and image.

**F. To Order the City of Knoxville to begin working with Knox County Schools with the following objectives:**

1. To amend the July 2019 MOA to more clearly define the scope and responsibilities of school officials and law enforcement to communicate, engage one another, and protect the lives of students, consistent with the other remedies requested in this Complaint, and with state and federal law.

2. To train all SSO's and other law enforcement personnel assigned to patrol the school, and all school administrative officials with regard to School Board Policy C-210 and the July 2019 MOA, and to require them to enforce it with regard to police officers who enter school property

3. To require all SSO's and SRO's assigned to the school to learn the names and interests of the students, and to patrol the school building perimeter, bathrooms, halls and other public spaces at least three times per day and to interact with any students found in the halls, grounds or bathrooms during class, and for the officer to immediately report to the principal any threat to a person's safety caused by the child with whom the officer interacted.

4. To implement the following Alternative Response Policy, to include a requirement to employ de-escalation tactics such as creating distance, giving time and space, tactical repositioning, verbalization, etc.) if possible, for intervening with children who may be experiencing mental health difficulties or crisis:

   A. To have all children in Knox County Schools identify a trusted adult at their school, who will receive a call with a request to intervene if the child appears to be experiencing distress or behavior issues;

   B. To call the parent of a child if the child appears to be experiencing severe emotional distress or engaging in poor behavior;

   C. If the parent is unavailable, or if the circumstances are exigent, for the School Principal to first consider calling an Alternative Response Team that does not include armed officers.

   D. To call the police or KPD's co-responder model, as appropriate, only if (i) the trusted adult and/or the parent is unable to intervene OR (ii) the school principal becomes concerned that the child is an immediate physical danger to himself or another.

   E. That upon calling law enforcement, the principal or vice principal is to personally inform the police of the child's last known whereabouts and any threat to himself or others that prompted the call, as well as any other pertinent information, such as disabilities that may obstruct compliance, intended to keep the child and others safe during the encounter with police.

F. That no law enforcement officer be allowed to enter school premises for the purpose of engaging a child without express personal face-to-face notice to the principal and a *bona fide* effort to notify the child's parent or guardian.

G. For the City of Knoxville to fully fund treatment for the students and families of Austin East High School to have access to mental health services to treat the trauma and grief caused by these events.

H. For $750,000 in compensatory damages to be awarded to Ms. Robinson from the City of Knoxville, plus $750,000 in punitive damages to be paid jointly and severally by Officer Willson and Officer Cash, payable to Ms. Robinson for herself and as next friend for Anthony Thompson, as well as any court costs, discretionary costs, pre- and post-judgment interest, and reasonable attorney fees.

I. For $750,000 in compensatory damages from the City of Knoxville to be paid to Gralyn Strong, plus $500,000 in punitive damages to be paid jointly and severally by the Defendants, as well as any court costs, discretionary costs, pre- and post-judgment interest, and reasonable attorney fees.

J. For such other, further and general relief as this Court deems appropriate and/or in the public interest.

Respectfully submitted this 11th day of April, 2022.

*S/Margaret Held*                         *S/Hoai Robinette*
Margaret Held                               Hoai R. Robinette
TN BOPR #018033                         TN BOPR#036174
Attorney for Chanada Robinson and    Attorney for Gralyn Strong
Anthony Thompson

HELD LAW FIRM                          800 South Gay Street, Suite 1950
1522 Highland Avenue                    Knoxville, TN 37929-9732
Knoxville, TN 37916                       Telephone (270) 304-7070
Telephone (865) 637-6550              Facsimile (865) 521-7433
Facsimile 522-6760                        Email hoairobinette@gmail.com
Email mbheld@heldlawfirm.com