# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

|  |  |  |
|---|---|---|
| CHANADA ROBINSON, for herself and as next of friend/next of kin for Anthony Thompson Jr., and GRALYN STRONG | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. 3:22-cv-125 |
| v. | ) ) | Judge Atchley |
| CITY OF KNOXVILLE, d/b/a the Knoxville Police Department, *et al.*, | ) ) ) | Magistrate Judge McCook |
| *Defendants*. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Defendant Baldwin, Cash, and Willson's Motion for Summary Judgment [Doc. 45] and Defendant Clabough's Motion for Summary Judgment [Doc. 49]. For the reasons explained below, both motions will be **GRANTED**.

## I.    FACTUAL BACKGROUND

This is a case where the facts are tragic but the law is clear. Anthony Thompson, Jr. attended Austin East Magnet High School in Knoxville, Tennessee, until his death on April 12, 2021. [Doc. 31 at ¶ 5]. Anthony was, devastatingly, just seventeen-years-old at the time of his death. [*Id.*]. Anthony passed away following an officer-involved shooting, and at issue in this lawsuit is whether Defendants bear any responsibility for his incredibly unfortunate death.

The shooting in this case unfolded in a matter of seconds, but the events leading up to it did not. Months before the shooting, Anthony began dating fellow Austin East student Alexus Page. [*Id.* at ¶ 18]. The relationship, by Plaintiffs' admission, "was at times turbulent," and a confrontation between the two occurred on April 12, 2021. [*Id.* at ¶ 29–34]. School security cameras captured that confrontation. [Doc. 45 Ex. 4, 5]. The footage, at a minimum, shows

Anthony grab Alexus's shirt, push her, snatch her phone, corner her against the wall, and grab her hair. [Doc. 45 Ex. 4 at 12:35:55, 12:39:00, 12:40:40; Ex. 5 at 12:48:10]. Following the confrontation, Alexus obtained permission to go home. [Doc. 31 at ¶ 34]. Alexus's mother, Regina Perkins, later called 911 at 1:59 p.m. to report what had transpired between her daughter and Anthony. [*Id.* at ¶ 56].

Officer Clabough arrived at Alexus's home shortly thereafter and questioned her about the confrontation. [Doc. 96 at 5–6]. Alexus's account largely tracked what the security footage depicted; she told Clabough that Anthony poked his finger in her face and took her phone. [Doc. 45 Ex. 9 at 14:16:08–42]. Ms. Perkins informed Clabough that Anthony had pushed her daughter's face and pulled her hair. [*Id.* at 14:13:08–24]. Ms. Perkins also told Clabough that Anthony "threatens her with a gun too" and had been known to carry a 9 mm gun. [*Id.* at 14:18:04–20]. Ms. Perkins said Alexus had seen the gun and Alexus agreed. [*Id.*]. Asked if Anthony had the gun with him at school, Alexus said she did not know but that they carry clear backpacks. [*Id.*]. Ms. Perkins told Clabough that students hide their guns in the bushes outside the school so they can pick them up when they leave. [*Id.* at 14:18:26–30].

After hearing these accounts, Clabough contacted the school resource officer at Austin East, Adam Willson. Willson had watched the security footage and confirmed that the confrontation unfolded as Alexus had described. [Doc. 61 at 4; Doc. 96 Ex. A5 at 14:54:26]. Before heading to Austin East to arrest Anthony, Clabough met with Officer Brian Baldwin and Lieutenant Stanley Cash to devise a plan for the situation. [Doc. 61 at 5]. The three officers then arrived at Austin East at approximately 2:53 p.m. [Doc. 96 Ex. A18 at 14:53:00]. Together with Willson and school security officer Nicholsha Scott, Clabough, Baldwin, and Cash reviewed the security footage of Alexus and Anthony's confrontation. [*Id.* Ex. A5 at 14:59:30 – 15:11:20]. The officers thereafter

exited the security room and headed to a bathroom down the hallway, where Anthony was located. [*Id.* Ex. A18 at 15:11:20 – 15:12:00].

The next thirty seconds or so proved consequential. Willson and Baldwin enter the bathroom at 3:11:56, followed by Clabough and Cash at approximately 3:12:09. [*Id.* Ex. A25 at 15:11:55; Ex. A5 at 15:12:07]. Willson and Baldwin find Anthony sitting on the toilet inside a bathroom stall, and Baldwin tells Anthony to stand up at 3:12:10. [*Id.* Ex. A5 at 15:12:10]. Anthony is wearing a hoodie—a zip-up sweatshirt with front pockets—and his hands are in his sweatshirt pocket when officers approach. [*Id.* at 15:12:21–23]. At 3:12:18, Willson twice instructs Anthony to remove his hands from his pockets. [*Id.* at 15:12:18]. Anthony stands up and steps forward, with his right hand remaining in his sweatshirt pocket. [*Id.* at 15:12:19–23]. Baldwin grabs Anthony's left arm while Willson and Clabough grab his right arm, during which time Anthony repeatedly exclaims "my bad, my bad." [*Id.*]. One to two seconds after the three officers grab hold of Anthony's arms, at 3:12:24, a gun fires, with the bullet striking a nearby trashcan. [*Id.* at 15:12:24–26]. The gun that fired was Anthony's, and he had been carrying it in his sweatshirt pocket. [*Id.*].

After the gun fires, Willson and Clabough continue to struggle with Anthony's right arm. [*Id.* at 15:12:25–27]. Anthony exclaims "wait, wait" several times. [*Id.*]. Clabough draws his weapon and shoots Anthony at approximately 3:12:28, just four seconds after Anthony's gun fired. [*Id.* at 15:12:27–28]. Anthony falls to the ground and his body rotates. [*Id.* at 15:12:29–31]. Willson moves to get on top of Anthony, and as he does so, Clabough fires a second shot, which strikes Willson instead. [*Id.*]. Contemporaneous with the second shot, a then unknown individual suddenly approaches Clabough from behind. [*Id.* at 15:12:32–33]. This individual, later identified as Plaintiff Gralyn Strong, was Anthony's best friend and had been sitting in the next bathroom stall before the gunfire. [Doc. 31 at ¶ 7, 69]. The video depicts Strong with his arm outstretched

3

towards Clabough, but the bodycam footage does not appear to jolt or jerk suddenly as might be expected if the wearer were pushed. [Doc. 96 Ex. A5 at 15:12:31–33]. The Parties dispute whether Gralyn merely tapped Clabough's shoulder or forcefully pushed him. [Doc. 88 at 20; Doc. 61 at 9]. Regardless, after being approached, Clabough immediately orders Gralyn to the ground, places him in handcuffs, and performs a pat down search for weapons. [Doc. 96 Ex. A5 at 15:12:33–42; 15:13:10–16; 15:13:35]. Gralyn remains handcuffed on the bathroom floor under Clabough's supervision for about 13 minutes. He is initially face down on the floor, facing Anthony, but is later moved to a seated position facing the same direction. [*Id.* at 15:12:40; 15:15:46]. At approximately 3:25 p.m., Clabough escorts him out of the bathroom and places him in the custody of another officer, about a minute after medical personnel determined Anthony was dead. [*Id.* at 15:24:45–15:26:06].

Within minutes after Anthony is shot, attention turns to his medical needs. Cash twice calls out "10-81 Austin East" over his radio at 3:12:49, which indicates to dispatch to notify "the Chief of Police, Major Crimes, responding officers, [and] first responders." [*Id.* at 15:12:49–51; Doc. 104 Ex. 1 at 5]. Facedown on the ground and initially facing Anthony, Gralyn pleads with officers to ignore him and help his friend. [Doc. 96 Ex. A5 at 15:12:57–15:13:20]. At 3:12:56 and 3:13:06, Clabough informs Gralyn that an ambulance is on the way. [*Id.* at 15:12:56, 15:13:06]. Less than two minutes after Anthony is shot, Baldwin states over the radio that "two 47's," or ambulances, are needed at 3:13:47. [*Id.* at 15:13:45; Doc. 96 Ex. A18 at 15:13:45]. Cash exclaims for medical to "step it up" twice within a twenty second interval and immediately after turning Anthony over and seeing the amount of blood. [Doc. 96 Ex. A18 at 15:14:24, 15:14:41–44; Doc. 104 Ex. 1 at 4]. In response to someone saying that 911 was needed, Cash indicates at 3:15:03 that two ambulances are on the way. [Doc. 96 Ex. A18 at 15:15:00–05]. School nurse Sharon Wright begins attending

4

to Anthony at approximately 3:17:00, about 5 minutes after he was shot at 3:12 p.m., and EMS personnel arrive on scene about 8 minutes after, around 3:20 p.m. [*Id.* at 15:16:54; Doc. 96 Ex. A25 at 15:20:23]. The EMS personnel render aid to Anthony for several minutes, until it becomes apparent that he had died. [Doc. 96 Ex. A25 at 15:20:23 – 15:24:11].

Following the events on April 12, 2021, Plaintiffs filed this lawsuit. Plaintiff Chanada Robinson, on behalf of her son, Anthony, asserts claims against Defendants for unlawful seizure, excessive force, wrongful denial of medical care, and various state law torts.[1] [Doc. 31 at ¶ 143–62]. Plaintiff Robinson also brings a Fourteenth Amendment claim on her own behalf for violation of her right to "care and society" of Anthony. [*Id.* at ¶ 1]. Meanwhile, Plaintiff Gralyn Strong raises claims against Defendants for unlawful seizure and various state law torts.[2] [*Id.* at ¶ 143–149, 159–62]. In their motions for summary judgment, Defendants argue that they are entitled to qualified immunity as to the federal causes of action and that Plaintiffs' state law claims fail as a matter of law. [*See generally* Docs. 48, 61].

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence

---

[1] In her Response to Defendants' motions for summary judgment, Plaintiff Robinson agreed to dismiss any claims for excessive force against Defendant Cash and for wrongful denial of medical care against Defendant Willson. [Doc. 96 at 2].

[2] Plaintiff Strong agreed to dismiss any claims against Defendant Willson for unlawful seizure in his response to Defendants' motions for summary judgment. [Doc. 89 at 2 n.1].

5

of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citations omitted). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475-76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

6

There is an added wrinkle to the summary judgment standard when video evidence is involved. "To the extent that videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). On the other hand, if the "facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

## III.    ANALYSIS

### A.  Plaintiff Robinson's Claims

The Court will first assess whether Plaintiff Robinson's claims can survive Defendants' motions for summary judgment. On behalf of her son, Anthony, Plaintiff Robinson asserts claims for unlawful seizure, excessive force, wrongful denial of medical care, and various state law torts. Plaintiff Robinson also asserts claims on her own behalf for violation of her right to "care and society" of Anthony and for intentional infliction of emotional distress. The Court will address each of these claims in turn.

#### 1.  Unlawful Seizure Claim

Plaintiff Robinson first raises on Anthony's behalf a claim against Defendants for unlawful seizure. Plaintiff contends that Defendants violated Anthony's Fourth Amendment rights by detaining him without a court order or underlying exigency. [Doc. 96 at 15]. Defendants argue that they are entitled to qualified immunity as to this claim. For the reasons that follow, Defendants are entitled to qualified immunity, and Plaintiff's unlawful seizure claim will be dismissed.

Government officials who violate a plaintiff's constitutional rights while acting under color of state law may be held liable under 42 U.S.C. § 1983. *Kentucky v. Graham*, 473 U.S. 159, 165–66

7

(1985) (citations omitted). However, the doctrine of qualified immunity may operate to shield government officials from liability in their performance of discretionary functions. *Stoudemire v. Mich. Dept. of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citations omitted). Qualified immunity will attach unless the government official "(1) violated a constitutional right (2) that was 'clearly established' at the time of the wrongdoing." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Court may resolve the case on either prong, and it is a plaintiff's burden to show that both prongs are satisfied to avoid dismissal of their claims on qualified immunity grounds. *Id.*

Here, Plaintiff fails the first prong of the qualified immunity analysis because she has not shown that Defendants violated Anthony's constitutional rights when they attempted to arrest him. The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S. CONST. AMEND. IV. To succeed on a Fourth Amendment false arrest claim, the plaintiff must demonstrate that the arresting officers lacked probable cause to carry out the arrest. *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (quoting *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005)). "For probable cause to exist for an arrest, the 'facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'" *Id.* (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003)).

Defendants unquestionably had probable cause to arrest Anthony based on the facts they knew at the time. School security footage showed Anthony grab Alexus's shirt, push her, snatch her phone, corner her against the wall, and grab her hair. This footage is clear and not subject to multiple interpretations. Based on Clabough's interviews of Alexus and Ms. Perkins and

8

Defendants' subsequent review of the footage, Defendants had probable cause to believe that Anthony had committed a domestic assault against Alexus, as defined in TENN. CODE ANN. § 39-13-111.[3]

Notwithstanding the video evidence, Plaintiff argues that because Anthony was a minor at the time, Defendants could only arrest him, or presumably any other minor in Tennessee, pursuant to a court order. [Doc. 96 at 16]. This argument is wholly without merit. The statute on which Plaintiff relies, TENN. CODE ANN. § 37-1-113(a)(1), provides that a child may be taken into custody in several circumstances. One is "[p]ursuant to an order of the court under this part." Another is "[p]ursuant to the laws of arrest." TENN. CODE ANN. § 37-1-113(a)(2).[4] Plaintiff's argument completely ignores this provision and the many cases which have found probable cause for law enforcement to take a juvenile into custody without a warrant. Probable cause is the touchstone of the laws of arrest; a warrant or court order is not required to make an arrest in public so long as the officers possess probable cause. *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979) (citing *United States v. Watson*, 432 U.S. 411, 414–24 (1976)).[5]

---

[3] TENN. CODE ANN. § 39-13-111(a)(3) clarifies that "minors who are dating or who have dated or who have or had a sexual relationship" can qualify as a "domestic abuse victim." Section (b) further provides that one commits a domestic assault if they commit an assault as defined in § 39-13-101. TENN. CODE ANN. § 39-13-111(b). The Code defines an assault as (1) intentionally, knowingly, or recklessly causing bodily injury to another; (2) intentionally or knowingly causing another to reasonably fear bodily injury; or (3) intentionally or knowingly causing physical contact with another which a reasonable person would regard as extremely offensive. TENN. CODE ANN. § 39-13-101(a).

[4] The statute further provides that the "taking of a child into custody is not an arrest, except for the purpose of determining its validity under the Constitution of Tennessee or the Constitution of the United States." TENN. CODE ANN. § 37-1-113(a)(4). As the constitutional validity of the seizure is precisely what is at issue in this litigation, this provision does not change the analysis.

[5] Even if Plaintiff's statutory argument were legally sound, it is clear that state law does not dictate the contours of Fourth Amendment protections. *Virginia v. Moore*, 553 U.S. 164, 176 (2008*)*. The Supreme Court has held, for example, that a warrantless arrest for an offense that is, by state law, a fine-only misdemeanor, is constitutional when that offense is committed in the officer's presence. 532 U.S. 318 (2001). In *Virginia v. Moore*, the Supreme Court determined that an arrest supported by probable cause does not violate the Fourth Amendment even if state law requires issuance of a citation instead of arrest. 553 U.S. at 176. The Court held: "[W]arrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.*

9

Plaintiff's citation to *Payton v. New York* does not change the result. 445 U.S. 573 (1980). Plaintiff relies on *Payton* for the proposition that even where probable cause exists, a warrant is required to make an arrest unless exigent circumstances exist. [Doc. 96 at 17]. But *Payton* dealt with a law that allowed officers to enter *private homes* without warrants to make arrests. 445 U.S. at 574. Here, Defendants attempted to arrest Anthony at a public school, a fact that renders *Payton* inapposite. The Court in *Payton* even referenced "the settled rule that warrantless arrests in public places are valid." *Id.* at 587. Contrary to Plaintiff's suggestion, probable cause, not exigency, is the relevant question when analyzing the validity of a public arrest. Because Defendants had probable cause to believe that Anthony committed a domestic assault, they had authority to take him into custody at Austin East and are thus entitled to qualified immunity on the unlawful seizure claim.

### 2. Excessive Force Claim

Plaintiff's next claim on Anthony's behalf is that Defendants Willson, Baldwin, and Clabough used excessive force against him. [Doc. 96 at 18]. Specifically, Plaintiff asserts that Defendants used excessive force when they grabbed hold of Anthony's arms, without giving him the opportunity to comply with their commands. [*Id.* at 20–21]. Defendants argue that they are entitled to qualified immunity, and the Court agrees.

When making an arrest, "the police have 'the right to use some degree of physical coercion or threat thereof to effect it.'" *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In assessing allegations of excessive force, the critical inquiry is whether the particular use of force was objectively reasonable under the circumstances. *Id.* (quoting *Graham*, 490 U.S. at 397). Courts conduct a totality of the circumstances analysis, with critical factors including (1) the severity of the crime at issue; (2)

whether the suspect poses an immediate threat to officer safety; and (3) whether the suspect is actively resisting arrest. *Graham*, 490 U.S. at 396. Importantly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

The Sixth Circuit has held that arresting officers may use some force to deal with a noncompliant suspect and bring the situation under control. *Bolden v. City of Euclid*, 595 F. App'x 464, 470–71 (6th Cir. 2014); *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). In *Bolden*, after an officer ordered plaintiff Martin to get on the ground, Martin began walking away and pulled out his cell phone from his pocket. *Bolden*, 595 F. App'x at 466. The arresting officer proceeded to smack Martin's phone out of his hand, throw him to the ground, and forcibly hold him down. *Id.* The Sixth Circuit held that the officer did not use excessive force. *Id.* at 470. Rather, he "was justified in using some force . . . to secure a non-compliant Martin," particularly because it was not clear at the time whether Martin had anything in his pockets. *Id.*

Defendants Willson, Baldwin, and Clabough did not use excessive force when they grabbed Anthony's arms. Though Plaintiff labors to depict Anthony as compliant, the video evidence suggests otherwise, with Anthony refusing to remove his *right* hand from his sweatshirt pocket after being instructed to do so multiple times.[6] As in *Bolden*, Anthony's refusal to comply with lawful commands justified Defendants in using some force to control the situation—namely, gaining control of Anthony's arms by grabbing them. Defendants did not know what Anthony had in his sweatshirt pocket, and it was reasonable for them to grab onto his arms in an effort to neutralize his noncompliance. In grabbing Anthony's arms, Defendants used the type of

---

[6] Plaintiff points out that Anthony removed his left hand from his sweatshirt pocket, and the video footage indeed shows him doing so. [Doc. 96 at 21]. Critically, however, Anthony's right hand remains in his pocket as Defendants Willson, Baldwin, and Clabough grab his arms.

reasonable, physical coercion officers may use in effecting an arrest. Their actions, simply put, did not qualify as excessive force.

Plaintiff's next excessive force argument focuses on Clabough using deadly force against Anthony. In particular, Plaintiff contends that if Anthony was not resisting arrest, and if Defendants had control of his gun when it fired, then Clabough was not entitled to use deadly force and discharge his weapon. [Doc. 96 at 24]. In support of the notion that Anthony was not resisting arrest, Plaintiff emphasizes his multiple pleas that Defendants "wait" as the struggle ensued. [*Id.* at 23]. Anthony's pleas to "wait" do not indicate a lack of resistance, even if he was trying to signal his willingness to comply. In *Dunn v. Matatall*, the Sixth Circuit confronted a similar situation. 549 F.3d 348 (6th Cir. 2008). There, the plaintiff refused to pull over as an officer attempted a traffic stop. *Id.* at 350–51. When the plaintiff eventually stopped, the officer approached the plaintiff's car and told him to unlock the door and to not move his hands. *Id.* at 351. The plaintiff complied, and the officer grabbed hold of one of the plaintiff's hands and attempted to remove him from the car. *Id.* A struggle ensued as a second officer arrived to assist. *Id.* Despite the plaintiff saying "okay" and "I'm coming, I'm coming," the two officers pulled the plaintiff from his car, leading him to fall and fracture his femur. *Id.* at 351–52. On these facts, the Sixth Circuit reached the following conclusion:

> Although Dunn's statement, "I'm coming, I'm coming," may indicate that he had decided to exit the vehicle on his own, only seconds elapsed between the time the seatbelt was unfastened and when Dunn was pulled out of the car, giving the Officers little opportunity to fully comprehend whether Dunn had finally decided to become compliant. It was reasonable for the Officers still to consider Dunn resistant.

*Id.* at 354–55. The facts in this case demand the same outcome. A mere four seconds elapsed between the time Anthony's gun fired, he pleaded with officers to "wait," and Clabough

discharged his weapon. In this rapidly unfolding situation, as in *Dunn*, Defendants had little to no opportunity to comprehend whether Anthony, through exclaiming "wait," had decided to comply.

Moreover, Plaintiff's argument that Willson possibly fired Anthony's gun amid the struggle does not create a material factual dispute.[7] [Doc. 96 at 23–24]. Even if Willson fired Anthony's gun, Clabough's firing of his own gun four seconds later was not objectively unreasonable. For Clabough's use of deadly force to be objectively reasonable, he needed to have "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Jordan v. Howard*, 987 F.3d 537, 543 (6th Cir. 2021) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). After a gun fired from inside Anthony's sweatshirt pocket, Clabough certainly had probable cause to believe that Anthony posed a threat of serious harm to himself and his fellow officers when he discharged his weapon four seconds later. This is so regardless of whether Anthony or Willson actually fired the gun, a fact that Clabough could not have been certain of in the chaos of the moment. *See Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018) (finding that the plaintiff's argument that his gun went off accidentally during a struggle with an officer did not impact the qualified immunity analysis and that "a reasonable officer in this setting would believe himself in serious danger, knowing [the plaintiff] had a gun and knowing it had discharged").

Clabough's use of deadly force was objectively reasonable, especially when considering the rapid timeframe within which the events unfolded. *See Mullins v. Cyranek*, 805 F.3d 760, 766–67 (6th Cir. 2015). In *Mullins*, the plaintiff brandished a gun, threw the weapon over the officer's shoulder after being told to drop it, and was then fatally shot by the officer. *Id.* at 767. That entire

---

[7] Plaintiff also asserts in her Response that Clabough could have fired Anthony's gun. [Doc. 96 at 23]. The video evidence, however, shows that Clabough's hand never went inside Anthony's sweatshirt pocket, where the gun was located. [*Id.* Ex. A5 at 15:12:22–25]. His hand remained outside of the pocket. [*Id.*].

13

sequence took place within a five-second span. *Id.* The Sixth Circuit concluded that the officer's use of deadly force was reasonable in light of the rapidly unfolding situation, even if his decision to shoot after the plaintiff threw his weapon may have appeared "unreasonable in the 'sanitized world of our imagination.'" *Id.*

As in *Mullins*, the relevant events in this case transpired in a matter of seconds; four seconds elapsed from the time Anthony's gun discharged to when Clabough fired his weapon. Whereas the officer in *Mullins* shot after the plaintiff threw away his gun and was technically no longer a threat, here Clabough fired his weapon when a struggle was ongoing and when it was still not clear who had hold of Anthony's gun. Thus, Clabough had even stronger cause than the officer in *Mullins* to believe that he faced a threat of serious harm that justified the use of deadly force. The Sixth Circuit granted qualified immunity to the officer in *Mullins*, and the same result is warranted in this case. Defendants like Officer Clabough "should not be denied qualified immunity 'in situations where they are faced with a threat of severe injury or death and must make split-second decisions . . . about the amount of force necessary to subdue such a threat.'" *Rush v. City of Lansing*, 644 F. App'x 415, 423 (6th Cir. 2016) (citation omitted).

### 3. Wrongful Denial of Medical Care Claim

Plaintiff's final federal claim on behalf of Anthony alleges that Defendants Baldwin, Clabough, and Cash deprived Anthony of his right to medical attention following the shooting. [Doc. 96 at 24]. Plaintiff asserts that Defendants failed to render aid to Anthony and intentionally ignored his medical needs. [*Id.* at 28]. Defendants, on the other hand, claim that they summoned medical assistance promptly and did not interfere with those providing care. [Doc. 104 at 7; Doc. 105 at 21]. Because Defendants discharged their duty to provide medical care by promptly calling

14

for an ambulance, they are entitled to qualified immunity as to this claim and it must be dismissed on that basis.

Plaintiff's wrongful denial of medical care claim operates as a Fourteenth Amendment substantive due process claim. *Colson v. City of Alcoa*, 37 F.4th 1182, 1186–87 (6th Cir. 2022). To prevail, Plaintiff must show that Defendants acted with "deliberate indifference" to Anthony's serious medical needs. *Est. of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001)). The deliberate indifference inquiry includes an objective and subjective component. *Id.* For the objective component, Plaintiff must demonstrate that Anthony had a "sufficiently serious medical need." *Id.* (citations and internal quotation marks omitted). As to the subjective component, Plaintiff needs to show that Defendants possessed "a sufficiently culpable state of mind in denying medical care." *Id.* (citations omitted). "Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [Anthony's] health and safety." *Watkins*, 273 F.3d at 686 (citing *Farmer v. Brennan*, 511 U.S. 825, 835–37 (1994)). "When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it." *Wilkerson*, 906 F.3d at 483 (citing *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1097–98 (6th Cir. 1992)).

Defendants did not wrongfully deny Anthony medical care in the aftermath of the shooting. It is indisputable that Anthony had a serious medical need having been shot in the chest at point blank range, but Defendants did not exhibit deliberate indifference in the situation. Instead, Defendants promptly summoned medical assistance and satisfied their Fourteenth Amendment obligations in doing so. Cash called out a "10-81" over his radio less than thirty seconds after the shooting to alert dispatch that shots had been fired. Approximately one minute later, Baldwin

15

radioed for "two 47's," or ambulances. Cash then urged first responders to "step it up" at 3:14:25, just under two minutes after Anthony was shot. These are not actions that display deliberate indifference to Anthony's medical needs. When the school nurse began attending to Anthony around 3:17 p.m., no Defendant interfered with her efforts. Nor did Defendants hinder the EMS personnel when they arrived a few minutes later. Moreover, Defendants were not obligated to provide medical treatment themselves, as Plaintiff implies. *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018) (holding that defendant officers were not required to intervene personally to provide medical treatment and that prompt summoning of assistance sufficed). And because Clabough reasonably relied on his nearby colleagues' calls for first responders as he secured and supervised Gralyn, he cannot be held liable for failing to summon assistance himself. *Hicks v. Scott*, 958 F.3d 421, 439 (6th Cir. 2020) (finding that the defendant officer did not exhibit deliberate indifference by failing to call paramedics himself because he had reasonably relied on his colleagues who had done so while standing just feet away). Indeed, Clabough testified that he pulled out his radio to call in the 10-81, when he heard Cash already calling it in. [Doc. 104-2 at 5]. Accordingly, neither Baldwin, Clabough, nor Cash denied Anthony's Fourteenth Amendment right to adequate medical care, and they are entitled to qualified immunity as a result.

### 4. State Law Claims

In addition to the federal claims, Plaintiff asserts state law causes of action for assault, battery, and intentional infliction of emotional distress on behalf of Anthony. [Doc. 31 at ¶ 155–62]. Plaintiff, for herself, also brings a claim for intentional infliction of emotional distress. [*Id.* at ¶ 159–62]. "This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary

Case 3:22-cv-00125-CEA-JEM   Document 112   Filed 09/28/23   Page 16 of 27   PageID #: 1917

judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011)). Nowhere in Plaintiff's Response to the motions for summary judgment does she respond to Defendants' arguments as to why the state law claims on her own and Anthony's behalf should be dismissed. [*See generally* Doc. 96]. Considering this failure, Plaintiff's personal claim for intentional infliction of emotional distress and her claims on Anthony's behalf for assault, battery, and intentional infliction of emotional distress are dismissed as abandoned.

### 5. Familial Association Claim

Plaintiff Robinson's final claim asserts that Defendants violated her Fourteenth Amendment right to the "care and society" of Anthony, which the Court construes as a familial association claim. [Doc. 96 at 30; Doc. 31 at 2, ¶ 131]. The Sixth Circuit has held that in § 1983 cases, "no constitutional violation of the right to family association exists without a state action directed at the family relationship." *Chambers v. Sanders*, 63 F.4th 1092, 1099 (6th Cir. 2023). Further, "[i]t is well established in this Circuit that 'a section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort.'" *Foos v. City of Delaware*, 492 F. App'x 582, 592 (6th Cir. 2012) (citations omitted). The Sixth Circuit therefore dismisses as collateral any claims a family member of one killed by law enforcement brings "to vindicate their *own* constitutional right to family integrity." *Chambers*, 63 F.4th at 1099–1100. As she was not the direct victim of Defendants' allegedly tortious conduct, Plaintiff Robinson's familial association claim is collateral, and for this reason it must be dismissed.

### B. Plaintiff Strong's Claims

The Court will now address Plaintiff Gralyn Strong's claims, which allege that Defendants unlawfully seized him and should be held liable for assault, battery, and intentional infliction of

emotional distress under state law. Because the Court concludes that Defendants are entitled to qualified immunity on the unlawful seizure claim and that Plaintiff's state law claims fail, Defendants' motions for summary judgment will be granted.

### 1. Unlawful Seizure Claim

Plaintiff Gralyn Strong first alleges that Defendants unlawfully seized him in violation of the Fourth Amendment. [Doc 88 at 13; Doc. 89 at 13]. Plaintiff contends that Defendants lacked reasonable suspicion or probable cause to seize him for the thirteen minutes immediately following the shooting. [*Id.*]. Defendants, by contrast, assert that they are entitled to qualified immunity because Plaintiff's detention was necessary to secure the scene and protect officer safety. For the reasons explained below, Defendants are entitled to qualified immunity, thus subjecting Plaintiff's unlawful seizure claim to dismissal.[8]

The Fourth Amendment ordinarily requires reasonable suspicion or probable cause to support the seizure of an individual. *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (citing *United States v. Heath*, 259 F.3d 522, 528 (6th Cir. 2001)). "However, even absent particularized reasonable suspicion, innocent bystanders may be temporarily detained where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others." *Bletz v. Gribble*, 641 F.3d 743, 755 (6th Cir. 2011) (citing *Michigan v. Summers*, 452 U.S. 692, 704–05 (1981)). These kinds of seizures generally must be limited in scope and are allowed only "where the officers making the seizures acted out of a justifiable fear of personal safety." *Id.* (quoting *Ingram v. City of Columbus*, 185 F.3d 579, 591–92 (6th Cir. 1999)).

---

[8] Because the Court finds that Plaintiff's detention was reasonable for purposes of securing the scene and protecting officer safety, it need not consider Defendants' alternative argument that the detention was supported by probable cause.

18

Concurrent with his second gunshot and just four seconds after the first, Clabough was suddenly approached from behind by Gralyn. [Doc. 96 Ex. A5 at 15:12:32–33]. None of the body camera footage definitively resolves whether Gralyn merely tapped Clabough on the shoulder or shoved him. [*Id.*]. For purposes of summary judgment, then, the Court will adopt the characterization most favorable to Plaintiff and assume that Gralyn only tapped Clabough on the shoulder. *See Latits*, 878 F.3d at 547 (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)). Even with this assumption, however, Clabough was justified in detaining Gralyn under the circumstances. As discussed above, Defendants lawfully attempted to arrest Anthony, and multiple gunshots were fired. Because Gralyn approached Clabough from behind immediately thereafter and amid this rapidly unfolding situation, it was reasonable for Clabough to temporarily detain and search Gralyn to confirm that he did not have any weapons. Gralyn's detention was therefore necessary to ensure that he posed no threat to officer safety and to secure the scene of a shooting that occurred only seconds earlier.

Notwithstanding the lawfulness of the detention to ensure officer safety, Plaintiff argues that Defendants' treatment of him was more akin to an arrest and thus required probable cause. [Doc. 89 at 18–20]. To support this claim, Plaintiff points to various statements Defendants made in depositions and to their conduct on the scene. [*Id.*]. Plaintiff contends that Defendants admitted in their depositions that they arrested him. [*Id.* at 18, 20]. This contention mischaracterizes the deposition testimony, particularly Clabough's given that he very clearly stated "I didn't arrest him" when asked. [Doc. 103-1 at 4]. Regardless, whether Defendants subjectively believed Gralyn was arrested does not affect the analysis, and Defendants never outwardly told Gralyn that he was under arrest.

19

Plaintiff also emphasizes Clabough's actions—ordering him to the ground, placing him in handcuffs, searching him, and keeping him in the bathroom for thirteen minutes—to claim that he was arrested rather than temporarily detained. [Doc. 89 at 19–20]. "[F]or a temporary detention on less than probable cause to be legitimate, it must satisfy the test of reasonableness." *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (citations omitted). The temporary detention must occur within a reasonable period of time and under reasonable circumstances, or otherwise it may ripen into an arrest that requires probable cause. *United States v. Avery*, 137 F.3d 343, 349 (6th Cir. 1997). "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (citations omitted). Critically, "[a] court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Id.*

Turning first to the length of the detention, the Court cannot say that Clabough and Defendants' decision to keep Gralyn in the bathroom for thirteen minutes was unreasonable. Clabough searched Gralyn for weapons shortly after ordering him to the ground and detaining him. In doing so, Clabough diligently pursued a course of investigation designed to dispel any suspicions that Gralyn might be armed. Plaintiff, however, contends that he should have been released from custody once it was determined that he possessed no weapons. [Doc. 89 at 22]. This argument ignores the swiftly developing nature of the situation and the fact that Anthony's gun remained on the floor near where Gralyn was being detained. [Doc. 96 Ex. A5 at 15:13:40–47]. Regarding Anthony's gun, Plaintiff relies on Defendants' deposition testimony, which purportedly reveals that they left the gun on the ground to preserve the scene and because they did not believe anyone, including Gralyn, posed a

threat by having access to it. [Doc. 89 at 23]. In so arguing, Plaintiff omits critical portions of the deposition testimony, including Clabough's statement that Gralyn posed no threat to access the gun only because he had detained Gralyn and stood in between him and the gun. [Doc. 89-2 at 10]. Accordingly, given the rapidly unfolding situation where shots had just been fired and where Gralyn suddenly approached Clabough from behind, the Court would be indulging in unrealistic second-guessing were it to decide that the thirteen-minute detention was for an unreasonable period of time.

Next, as to the manner of the detention, Clabough's actions in ordering Gralyn to the ground, handcuffing him, and searching him were not tantamount to an arrest. "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (citing *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999)). Thus, the use of handcuffs does not necessarily exceed the bounds of a permissible *Terry* stop. *Id.* Here, the use of handcuffs was warranted under the circumstances. Because Gralyn approached Clabough from behind just after he had been involved in a struggle and fired two gunshots, Clabough was justified in detaining Gralyn with handcuffs and searching him to secure the scene and ensure that he posed no threat to officer safety. In light of the foregoing, no constitutional violation resulted from Gralyn's thirteen-minute detention, and Defendants are entitled to qualified immunity on this basis.

Even if Defendants' seizure of Plaintiff was unlawful, Plaintiff has not shown that the unlawfulness of their conduct was clearly established. "The doctrine of qualified immunity insulates state actors from liability in close-call situations." *Lemmon v. City of Akron, Ohio*, 768 F. App'x 410, 414 (6th Cir. 2019). It provides law enforcement officers with "breathing room to

make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (*quoting Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)).

"[I]nquiry into whether a right was clearly established must be conducted 'in light of the specific context of the case.'" *Andrews v. Hickman County*, 700 F.3d 845 (6th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). This means that the contours of the right must be sufficiently clear that a reasonable officer would know that what he is doing violates the right. *Id.* "Given the context-specific nature of the inquiry, there are 'limitations upon the extent to which a court may rely on holdings in contexts other than the one being considered to demonstrate that a principle has been clearly established.'" *Id.* (quoting *Ohio Civ. Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1176 (6th Cir. 1996)). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Courts have emphasized that the plaintiff's burden to show that "the violative nature of particular conduct is clearly established" is "especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Fleming v. Scruggs*, 465 F. Supp. 3d 720, 739-40 (E.D. Mich. 2020). (cleaned up, citation omitted).

It is Plaintiff's burden to demonstrate that the law prohibiting Defendants' conduct was clearly established at the time. He can do so "by citing to cases of controlling authority . . . at the time of the incident or a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Sultaana v. Corrigan*, 2021 WL 7160160, at *2 (6th Cir. Sept. 9, 2021) (internal citation and punctuation omitted). Turning to the cases cited by Plaintiff, the Court finds he has not met his burden.

Plaintiff first cites *Ingram v. City of Columbus* to contend that the alleged unlawfulness of Defendants' conduct was clearly established. [Doc. 89 at 15–17, 29]. In that case, after an undercover officer told the suspect, Carroll, that he was under arrest for offering to sell drugs, Carroll fled on foot and entered the plaintiffs' home. *Ingram*, 185 F.3d at 584. Officers followed Carroll, and upon entering the home, they found Ray Womack sleeping in the basement and arrested him, mistakenly believing he was Carroll. *Id.* at 585. After realizing their mistake, officers returned to the basement, located Carroll, and arrested him. *Id.* Officers then uncuffed Ray Womack but handcuffed Betty Ingram, who had been napping when they entered the home and had previously asked them to let Ray go. *Id.* One of the officers shook Ingram violently as she sat on her couch in handcuffs. *Id.* On these facts, the Sixth Circuit held that the defendant officers lacked the justifiable fear of personal safety necessary to support Ingram's detention:

> Here, there is no evidence to suggest that Defendants had reason to fear for their personal safety. In the events preceding Defendants' entry into [the plaintiffs' home], Carroll had not displayed a weapon, and the officers possessed no independent information leading them to believe that Carroll was a dangerous individual. Nor does the record disclose behavior on the part of Plaintiffs leading Defendants to justifiably fear for their safety, or any reason for Defendants to believe that [the plaintiffs' home] contained weapons that might be used against them. Most importantly, however, the record suggests that Defendants placed Ingram . . . in handcuffs after they had already located and handcuffed Carroll and presumably no longer needed to "secure" the area as they searched for their suspect.

*Id.* at 592. The facts of this case are distinguishable from *Ingram*. Whereas Carroll had not displayed a weapon or given officers reason to believe he posed any danger, Anthony engaged in a struggle with Defendants that saw his gun discharge. As the struggle ensued and contemporaneous with Clabough firing his second shot, Gralyn suddenly approached him from behind and tapped his shoulder. Though seemingly innocuous, the timing of Gralyn's conduct and the surrounding chaotic circumstances, where gunfire had just been exchanged, provided Clabough with reason to fear for his personal safety when he was abruptly tapped on the shoulder. This

23

setting differs from that in *Ingram*, where the plaintiff had been napping in an otherwise calm home environment before Carroll entered and officers followed. For these reasons, *Ingram* does not dictate that Defendants' violated any clearly established constitutional rights.

In addition to *Ingram*, Plaintiff relies on *Bletz v. Gribble* to support his view that the alleged unlawfulness of Defendants' conduct was clearly established. [Doc. 89 at 17–18, 29]. There, officers arrived at the home of Fred and Kitti Bletz to execute an arrest warrant for their son, Zachary. *Bletz v. Gribble*, 641 F.3d 743, 747 (6th Cir. 2011). Zachary spoke with officers outside, and they allowed him to reenter the house to obtain shoes before being taken to jail. *Id.* at 748. As Zachary entered the house, officers followed and observed Fred holding a gun. *Id.* Officers ordered Fred to drop the weapon, but when he did not comply, one of the officers shot and killed him. *Id.* Kitti then entered the room and was ordered to the ground, handcuffed, and placed into a police car for approximately one hour. *Id.* at 748, 755. The Sixth Circuit concluded that a jury could find Kitti's one hour detention to have been objectively unreasonable. *Id.* at 755. Though "the officers may have been initially justified in detaining Kitti due to safety concerns," the Sixth Circuit found that those concerns waned as time progressed and that it presumably "took less than one hour for back-up to respond to the officers' call of a fatal shooting, thereby removing all legitimate safety concerns." *Id.*

The length of the detention in this case renders it sufficiently distinct from *Bletz*. It is true that both Kitti and Gralyn were detained following officer-involved shootings, but the difference in length between the detentions—thirteen minutes versus one hour—is significant. Indeed, the Supreme Court has refused to delineate "a hard-and-fast time limit for a permissible *Terry* stop" and has declined to adopt a per se rule that would deem any twenty-minute detention unreasonable. *Sharpe*, 470 U.S. at 686. Further, while Kitti was detained in a police car, away from Fred's gun

24

that remained in the home, Clabough detained Gralyn in the bathroom, just feet away from where the shooting took place and where Anthony's gun remained on the floor. Given Gralyn's proximity to the gun, there was a continued safety risk, which was not the case in *Bletz*. Based on these key factual differences, then, Plaintiff cannot rely on *Bletz* to demonstrate that the law allegedly prohibiting Defendants' conduct was clearly established at the time.

Finally, Plaintiff alleges that Gralyn was detained for an additional four hours by the Knoxville Police Department. [Doc. 89 at 11]. Because there is no suggestion that any of the individual defendants were involved in this aspect of his detention, the Court has no occasion to address that issue.

### 2. State Law Assault and Battery Claims

In addition to his unlawful seizure claim, Plaintiff asserts claims for assault, battery, and intentional infliction of emotional distress under Tennessee law. [Doc. 31 at ¶ 156, 159]. Having found Defendants are entitled to qualified immunity as to the unlawful seizure claim, the Court likewise finds they are entitled to qualified immunity as to the state law claims for assault and battery. Courts routinely hold that where claims for assault and battery arise from the same circumstances as a Fourth Amendment excessive force claim, the analysis is the same for both causes of action. *See, e.g.*, *Dubose v. City of Knoxville*, 2023 WL 3766813, at *8 (E.D. Tenn. June 1, 2023). Though Plaintiff brings a claim for unlawful seizure and not excessive force, the same framework applies here. Thus, Plaintiff's state law claims for assault and battery are dismissed considering the Court's finding that Defendants are entitled to qualified immunity on the unlawful seizure claim.

Plaintiff's claim for intentional infliction of emotional distress also must be dismissed. To succeed on such a claim under Tennessee law, a plaintiff must show, *inter alia*, that the conduct

complained of was "so outrageous that it is not tolerated by civilized society." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012) (citations omitted). Because the Court has explicitly found that Defendants acted reasonably and did not violate Plaintiff's constitutional rights, their conduct necessarily does not qualify as outrageous. *Long v. City of Coopertown*, 801 F. Supp. 2d 674, 690 (M.D. Tenn. 2011).

## IV.     CONCLUSION

It is not lost on the Court that Plaintiffs have suffered an unspeakable tragedy. At just seventeen-years-old, Anthony was taken from this world far too soon. Plaintiff Robinson lost her son, and Plaintiff Strong lost his best friend. But the Court is bound by the law in even the most tragic circumstances, and the law requires dismissal of Plaintiffs' claims against the individual defendants.[9] Accordingly, for the reasons explained above, it is **ORDERED**:

- Defendant Baldwin, Cash, and Willson's Motion for Summary Judgment [Doc. 45] and Defendant Clabough's Motion for Summary Judgment [Doc. 49] are **GRANTED**;

- Plaintiff Robinson's claims against Defendants Baldwin, Cash, Willson, and Clabough for unlawful seizure, excessive force, wrongful denial of medical care, and interference with familial association are **DISMISSED WITH PREJUDICE**;

- Plaintiff Robinson's state law claims against Defendants Baldwin, Cash, Willson, and Clabough for assault, battery, and intentional infliction of emotional distress are **DISMISSED AS ABANDONED**;

- Plaintiff Strong's claims against Defendants Baldwin, Cash, Willson, and Clabough for unlawful seizure, assault, battery, and intentional infliction of emotional distress are **DISMISSED WITH PREJUDICE**.

---

[9] This Order does not pertain to or address Plaintiffs' claims against the City of Knoxville, d/b/a the Knoxville Police Department. Those claims remain outstanding as of the entry of this Order.

**SO ORDERED.**

/s/ Charles E. Atchley, Jr.
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**