# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: February 26, 2025

Ms. Margaret B. Held
Held Law Firm
1522 Highland Avenue
Knoxville, TN 37916

Mr. John Morris Kizer
Gentry, Tipton & McLemore
900 S. Gay Street
Suite 2300
Knoxville, TN 37901

Mr. W. Morris Kizer
Gentry, Tipton & McLemore
900 S. Gay Street
Suite 2300
Knoxville, TN 37901

Mr. Ronald Eugene Mills
City of Knoxville Law Department
400 Main Street
Suite 699, P.O. Box 1631
Knoxville, TN 37902-0000

Mr. Gary M. Prince
Mr. Nathaniel Craig Strand
O'Neil, Parker & Williamson
7610 Gleason Drive
Suite 200
Knoxville, TN 37919

Re: Case No. 24-5159, *Chanada Robinson, et al v. City of Knoxville, TN, et al*
Originating Case No. : 3:22-cv-00125

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Ms. LeAnna Wilson

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name:  25a0111n.06

No. 24-5159

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 26, 2025
KELLY L. STEPHENS, Clerk

CHANADA ROBINSON, for herself and as next friend/next of kin for Anthony Thompson, Jr.; GRALYN STRONG,

     Plaintiffs-Appellants,

v.

CITY OF KNOXVILLE, TENNESSEE, et al.,

     Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE

OPINION

Before: CLAY, WHITE, and NALBANDIAN, Circuit Judges.

     CLAY, J., delivered the opinion of the court in which WHITE, J., concurred, and NALBANDIAN, J., concurred in all but Part D.  NALBANDIAN, J. (pp. 27–35), delivered a separate opinion concurring in part and dissenting in part.

     **CLAY, Circuit Judge.**  Plaintiff Chanada Robinson, on behalf of herself and her deceased son, Anthony Thompson, along with Plaintiff Gralyn Strong, appeal the district court's grant of summary judgment for Defendants based on qualified immunity.  For the reasons set forth below, we **AFFIRM** the district court's judgment in part and **REVERSE** in part.

**I.     BACKGROUND**

**A.  Factual History**

     On April 12, 2021, Regina Perkins called 911 to report an altercation between her teenage daughter, Alexus Page, and her daughter's teenage boyfriend, Anthony Thompson, at Austin East

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Magnet High School ("AEMHS" or "the school") in Knoxville, Tennessee.  Ms. Perkins told the

911 operator that Thompson assaulted Page at school that day and had choked and abused her on

previous occasions.  Because of the incident with Thompson, the school permitted Page to go home

for the day.

The Knoxville Police Department ("KPD") dispatched Officer Clabough to Ms. Perkins'

home to speak with her and Page about the incident.  Upon arrival, Perkins told Clabough that

Page had been completing schoolwork in the principal's office that day to avoid Thompson.

Nonetheless, Thompson came looking for Page and began to beat on the window glass.  Perkins

said that when Page exited the principal's office, Thompson kept "pushing [Page] in her face" and

"pulling [Page's] braids."  Ex. 9 Clabough Selma Video, R. 45, Page ID #405 at 14:13:19–22.[1]

Shortly thereafter, Page came out of the house and recounted the same story, telling Clabough

about not wanting to leave the principal's office to speak with Thompson because whenever she

and Thompson were together, it "[got] physical."  *Id*. at 14:15:10–13.

Consistent with Perkins' statements, Page told Clabough that Thompson "put his finger

into [her] face," told her to be quiet, pushed her up against the wall, and took her phone.  *See id*.

at 14:16:10–44.  Additionally, Page said that Thompson "ke[pt] threatening [her]" and that she was

tired of the threats, the fights, and being scared.  *Id*. at 14:17:55–14:18:03.  Perkins told Clabough

that Thompson "threaten[ed] [Page] with a gun," and "[was] known to carry a nine-millimeter

[gun]."  *Id*. at 14:18:05–09.  Page confirmed having seen the gun but did not know whether

Thompson had it at school and mentioned that the students carried clear backpacks.  Officer

Clabough took down Thompson's contact information from Perkins and Page, and Page showed

Clabough a picture of Thompson on her cellphone.

---

[1] The timestamps displayed on the video footage are presented in military time.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

After gathering information from Perkins and Page, Clabough went to his car to contact Officer Willson, the AEMHS School Resource Officer ("SRO"), to inquire what he knew about the situation. Willson told Clabough that the school was attempting to locate video footage of the incident between Thompson and Page. He also mentioned that Thompson "had a history of fighting in the school." Ex. 10 Officer Clabough Interview, R. 45, Page ID #406 at 10:21:44. After speaking with Willson, Officer Clabough returned to Perkins' front porch and told Perkins that he would go to the school and arrest Thompson. Page also confirmed to Clabough that she and Thompson had been dating for several months. Clabough told Page to go to the Family Justice Center for an order of protection to keep Thompson away. Clabough then radioed other officers for assistance.

### 1. Pre-Shooting Events

Officer Clabough drove to the school where he met Officers Willson, Baldwin, and Cash. Willson told Clabough that the school was trying to locate Thompson and confirmed that everything had taken place as described. A few minutes later, KPD officers entered the School Security Office to view video footage of the incident. They proceeded to watch video footage of Thompson and Page outside the principal's office, where the events depicted on video showed Thompson pulling Page by her shirt, grabbing her hair, and cornering her against the wall. Afterwards, Officers exited the security office and walked down the hall to the school bathroom, where Thompson was located. Once inside the bathroom, the Officers called, "Who's in here?" Ex. 12 Baldwin Body Cam, R. 45, Page ID #408 at 15:11:58. They found Thompson sitting on the toilet inside a bathroom stall, with the door open. Willson said, "Hey Anthony, how are you doing, man?" and instructed him to stand up. *Id*. at 15:12:04–08. Baldwin and Willson each asked Thompson to stand up again. Thompson placed his hands inside his pockets and stood up from

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

the toilet. Officer Willson ordered Thompson twice to keep his hands out of his pockets. Thompson said, "My bad, my bad," as Willson and Baldwin took hold of his arms. *Id*. at 15:12:21–23.

From this point, the events in the bathroom unfolded rapidly and with some degree of uncertainty.[2] A struggle ensued between Thompson and the Officers holding him. The body cameras of Officer Baldwin and Officer Cash detached and fell to the ground. Officer Willson reached into Thompson's pocket while Baldwin continued to restrain him. During the struggle, Thompson's gun fired and hit the trashcan beside Officer Baldwin, while Thompson screamed, "Wait, wait, wait, wait!" *See* Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:12:24–26. Roughly four seconds later, Officer Clabough fired his gun at Thompson, who fell to the ground. Willson climbed on top of Thompson, who was still moving. Clabough fired a second shot at Thompson but mistakenly hit Willson.

### 2. Post-Shooting Events

Almost immediately after the second shot was fired, Gralyn Strong, Thompson's friend, emerged from another bathroom stall and came up behind Clabough. Clabough ordered Strong to the ground, and he complied. Meanwhile, Cash handcuffed Thompson, who remained on the ground. Baldwin pulled Officer Willson, who was unable to move himself due to the gunshot wound, out of the bathroom and into the hall. Officer Cash radioed for help, stating, "10-81 Austin East, 10-81 Austin East." *See* Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:12:50. Officer Clabough informed Strong that an ambulance was on the way and ordered Strong to put his hands behind his back. Strong pleaded with the Officers to help Thompson, repeatedly asking

---

[2] There are some minor discrepancies in the time stamps on the body camera footage of the Officers, but these discrepancies usually fall within one to two seconds of each other.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

them to do something and shouting that Thompson was bleeding.  *See id.* at 15:13:11–15:14:23 (showing that Strong yelled, "He bleeding," "please help him," "the fuck is y'all doing," "he fucking bleeding," "that's my brother," "y'all is tripping," and other similar exclamations, numerous times).  Clabough removed Strong's backpack to search it.

During this time, Officer Cash retrieved his body camera from the ground.  Someone on the recording offered Willson a tourniquet at least three times.  Thompson remained on the floor beside a puddle of blood, with Officer Cash standing over him, holding his arms down.  Cash rolled Thompson over, saw the extent of his wound, and exclaimed, "Step it up!"  *See* Ex. 16 Cash Body Cam, R. 45, Page ID #412 at 15:14:25.  Cash then took a moment to wash his hands in the sink, before reassuming his stance over Thompson.  Cash rolled Thompson onto his back again, revealing a large amount of blood, and repeated, "Step it up! Step it up!"  *Id.* at 15:14:43.  Someone came up to Cash and asked, "What happened to this guy?" and Cash responded, "[Thompson] shot himself it looks like."  *Id.* at 15:14:56.  Soon after, Cash started wrestling with Thompson's backpack, requested a knife to cut it off, and eventually began cutting the straps.  The camera footage recorded one of the officers reporting to dispatch, "One officer down."  Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:16:56.  Around this time, a female nurse arrived and began examining Thompson, and Cash observed that Thompson was still breathing.

In the background, the audio recorded a large amount of indistinct yelling.  Officer Baldwin approached Clabough to ask if he was okay, and the two officers bumped fists.  This action upset Strong, who argued with the Officers for about one minute and told them, "That's not your brother on the floor," as the Officers attempted to calm him down by saying, "I understand," and "I'm here."  *See* Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:17:37–15:18:18.  Meanwhile, Officer Cash's body camera captured the nurse attending Thompson, along with a female officer.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

These individuals removed Thompson's handcuffs, followed by his shirt. At 15:20:25, the paramedics entered the bathroom. One of the officers radioed to dispatch that there was "no active shooter." *See* Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:21:37. The EMS personnel continued to assist Thompson until it became apparent that he was deceased.

For the duration of these events, Strong remained handcuffed on the bathroom floor, until Officers escorted him out at 15:25:06. In the hallway, while gesturing to Strong, Officer Clabough said to the sergeant: "This fellow here was in the bathroom, what do we need to do with him?" *Id.* at 15:25:31–34. The sergeant responded that he would get somebody else to take Strong to the police station. Officer Cash pointed at Strong and said what sounded like, "Does somebody else secure him?" *Id.* at 15:26:04–07. A different officer then removed Strong from the building.

### B.  Procedural History

On April 11, 2022, Chanada Robinson, mother of the late Anthony Thompson, along with Gralyn Strong, commenced this action against Defendant Officers Clabough, Baldwin, Cash, and Willson ("the Officers"), in addition to the City of Knoxville. Plaintiffs Robinson and Strong later amended their complaint to add various other claims against Defendants. The Officers filed answers denying liability and raised the affirmative defense of qualified immunity. The City similarly denied liability.

On November 30, 2022, the Officers filed two separate motions for summary judgment based on qualified immunity and sought dismissal of all claims against them. On September 28, 2023, the district court granted both motions for summary judgment. The City of Knoxville also filed its own motion for summary judgment, which the district court granted on February 14, 2024.[3]

---

[3] Plaintiffs failed to preserve their claims against the City of Knoxville for appellate review because they did not advance any such arguments in their opening brief. To preserve an issue, a litigant must brief the issue on appeal. *See Puckett v. Lexington-Fayette Urban Cnty. Gov't*, 833

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

## II.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's grant of a motion for summary judgment on qualified immunity grounds.  *Barton v. Martin*, 949 F.3d 938, 946 (6th Cir. 2020).  Summary judgment is only appropriate if the movant can show there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In reviewing a motion for summary judgment, this Court views the evidence in the light most favorable to the nonmoving party.  *Barton*, 949 F.3d at 947.

There are two components to the qualified immunity analysis.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Therefore, in the qualified immunity context, dismissal by summary judgment is improper when "the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right."  *Barton*, 949 F.3d at 947.  This Court has discretion to decide which of the two prongs of the qualified immunity analysis to address first.  *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 275 (6th Cir. 2020).

"'There is, however, an added wrinkle' where the record contains 'a videotape capturing the events in question.'"  *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022) (citation

---

F.3d 590, 610–11 (6th Cir. 2016).  The only language in Plaintiffs' brief implicating the City of Knoxville can be found in their Concise Statement of the Case, in which they allege that the City of Knoxville failed to "properly train the officers."  Appellant Br., ECF No. 28, 10.  However, none of the issues presented even mention the City of Knoxville, and neither does the entirety of Plaintiffs' argument.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

omitted).  This Court must not "adopt a version of the facts that is blatantly contradicted by video footage that is not doctored or altered in any way, and which clearly depicts the events that actually happened."  *Id*. (cleaned up).  However, this Court must "view any relevant gaps or uncertainties left by the videos in the light most favorable to the [p]laintiff," and "make all reasonable inferences in their favor."  *Id*. (quoting *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017); *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

## III.    DISCUSSION

### A.  WRONGFUL ARREST CLAIM (THOMPSON)

Plaintiff Robinson argues that the Officers lacked probable cause to arrest Thompson because the events on the school security footage were not sufficiently clear.  Defendants respond that the video footage contained incontrovertible evidence that Thompson assaulted Page, thereby establishing probable cause.  After carefully reviewing the footage, we agree with Defendants.

### 1.    Constitutional Violation

Plaintiff has not demonstrated a genuine dispute of material fact that Thompson's arrest violated his Fourth Amendment right to be free from an unlawful seizure.  Officers may conduct a warrantless arrest when there is probable cause to believe that a criminal offense has been or is being committed.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  In determining whether an officer had probable cause, this Court considers the totality of the circumstances, looking to both "evidence of guilt" and "exculpatory evidence" available to the officer at the time.  *Ouza*, 969 F.3d at 279.  If there is "more than a mere scintilla of evidence" that the suspect's conduct did not give rise to probable cause, as judged from the standpoint of reasonable officers on the scene, then a genuine fact dispute is created.  *Harris v. City of Saginaw*, 62 F.4th 1028, 1037 (6th Cir. 2023) (citation omitted).

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Defendants had probable cause to arrest Thompson based on Perkins' and Page's statements to police describing acts of domestic abuse that were verified by video footage. *See* T.C.A. § 36-3-619(a). Page told Officer Clabough that Thompson "put his finger into [her] face," pushed her against the wall, and took her phone. *See* Ex. 9 Clabough Selma Video, R. 45, Page ID #405 at 14:16:10–42. Perkins also told Clabough that Thompson kept "pushing [Page] in her face" and "pulling [Page's] braids." *Id*. at 14:13:19–22. Additionally, Page said that "every time [she and Thompson] talk[ed] in person, it [got] physical." *Id*. at 14:15:10–12. These statements are consistent with the school security footage, and Robinson's claim that "[t]he video does not clearly show any physical contact," is blatantly contradicted. Appellant Br., ECF No. 28, 12. First, the video shows Thompson pull Page's hair. Thompson then proceeds to grab Page by her shirt and shove her. He also appears to grab her phone and corner her against the wall. On a different security camera, Thompson was again captured pulling Page's hair.

Viewed in the light most favorable to Thompson, the security footage nonetheless demonstrates that his actions were consistent with Page's accusations, regardless of whether he intended to harm Page. Even standing alone, Page's accusations may well have been enough to establish probable cause. *See Ahlers v. Schebil*, 188 F.3d 365, 370–71 (6th Cir. 1999) (holding that a victim's accusation was enough to establish probable cause). Certainly, though, the Officers had probable cause to arrest Thompson after confirming that the footage corroborated Page's account of the incident. *See Manley v. Paramount's Kings Island*, 299 F. App'x 524, 529 (6th Cir. 2008) (holding that security footage of a reported theft was "[t]he most critical evidence," and strongly supported probable cause when corroborated by an account of the victim's friend).

As a final matter, we briefly address Plaintiff's argument that Thompson had a reasonable expectation of privacy in the school's public bathroom, which is wholly without merit. The right

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

to conduct a warrantless arrest in public, based on probable cause, is firmly ingrained in the law of this country. *United States v. Watson*, 423 U.S. 411 (1976); *United States v. Santana*, 427 U.S. 38 (1976). Plaintiff asserts that the warrantless arrest of Thompson contravenes "a teenager's privacy interest in going to the bathroom." Appellant Br., ECF No. 28, 28. The basis for such a claim is unclear, especially since Thompson was not "going to the bathroom" when the Officers approached him; he was using his cell phone with the stall door open, evincing that Thompson was not concerned with his privacy at the time.

Notably, this Court has cited an Eighth Circuit decision that "rejected the privacy claim of a defendant who police observed in a restroom stall during the course of a 'lawful investigative stop.'" *United States v. Harris*, 255 F.3d 288, 295 (6th Cir. 2001) (citing *United States v. Delaney*, 52 F.3d 182, 188 (8th Cir. 1995)). Accordingly, Thompson's presence in the school bathroom, a public place, did not prevent the Officers from conducting a lawful arrest based on probable cause. Because no constitutional violation occurred, Plaintiff Robinson fails the first prong of this qualified immunity test.

### 2.    Clearly Established

The second prong involves asking whether, at the time of the alleged conduct, Plaintiff's right was clearly established. A right is clearly established when existing precedent has placed "the statutory or constitutional question beyond debate," although a case need not be "directly on point." *Ashcroft*, 563 U.S. at 741. Importantly, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The burden is on Plaintiffs to show that Defendants are not entitled to qualified immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

The district court did not reach this part of the analysis because it found that Defendants had probable cause to arrest Thompson for domestic assault, and since no constitutional violation occurred, Defendants were entitled to qualified immunity on this issue. Indeed, Plaintiff has not shown that reasonable officers in Defendants' position could not have arrested Thompson based on the information available to them at the time, which included Page's firsthand account of the domestic assault as well as video footage to support it. Plaintiff has also not shown a clearly established right to be immune from arrest inside a public bathroom, either in 2021 or at any other point in time. Rather, Plaintiff merely argues that the Officers needed a warrant to arrest Thompson in the bathroom because no exigency existed. But the relevant inquiry here is probable cause, not exigency. Police officers, like any other member of society, do not require a warrant to enter a public space. *See Watson*, 423 U.S. at 423. Because no constitutional violation occurred in the arrest of Thompson inside the public-school bathroom, Defendants did not violate Thompson's clearly established rights and are entitled to qualified immunity on this issue.

## B. WRONGFUL ARREST CLAIM (STRONG)

Defendants argue that Plaintiff Strong waived his right to appellate review on the unlawful seizure claim by not filing a notice of appeal pursuant to Fed. R. App. P. 3(c). They base this assertion on *Torres v. Oakland Scavenger Co.*, which held that a court "may not waive the jurisdictional requirements of Rules 3 and 4, even for 'good cause shown' under Rule 2, if it finds that they have not been met." 487 U.S. 312, 317 (1988). Defendants observe that Gralyn Strong was identified as "JENNIFER STRONG for Gra[]lyn Strong" on the notice of appeal, even though Jennifer Strong did not end up being a party to the dispute. Appellee Br. Clabough, ECF No. 31, 47–48; Notice of Appeal, R. 129, Page ID #2167. Thus, Defendants argue that this Court lacks jurisdiction over Strong's appeal under *Torres*. This interpretation of *Torres* is misguided.

- 11 -

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Although a litigant must comply with the basics of Rule 3, *Torres* permits this Court to "construe the Rules liberally" so that "mere technicalities" do not bar a case from consideration on the merits. 487 U.S. at 316–17 (quoting *Foman v. Davis*, 371 U.S. 178, 181 (1962)). In *Torres*, the Supreme Court reviewed a case where the petitioner wholly failed to name himself in the notice of appeal, instead using the designation, "et al." *Id*. at 317. The Court reasoned that the purpose of Rule 3(c) is to provide notice regarding the identity of the parties, and that the all-encompassing phrase, "et al.," could not reasonably provide such notice. *See id*. at 317–18. Rather, "[t]he specificity requirement of Rule 3(c) is met only by some designation that gives fair notice of the specific individual or entity seeking to appeal." *Id*. at 318. In the instant case, that requirement is met.

Strong is clearly identified on the notice of appeal. He is named with his mother, Jennifer Strong, in both the caption and body of the notice. While the designation of "JENNIFER STRONG for Gra[]lyn Strong" was improper, it cannot be said that the inclusion of Jennifer Strong's name failed to put Defendants on notice of Strong's identity or intent to appeal. Notice of Appeal, R. 129, Page ID #2167. Accordingly, we regard this error as a "mere technicalit[y]" and proceed to review Strong's appeal on the merits. *See Torres*, 487 U.S. at 316.

Strong argues that the Officers did not have a warrant to arrest him, and therefore his detention was an unlawful seizure. Particularly, Strong contends that his continued detention outside the bathroom became an unlawful arrest. Defendants argue they were not responsible for Strong's continued detention because they transferred custody of Strong to different KPD officers, citing the district court's conclusion that because Defendants were not involved in that aspect of the detention, the court "ha[d] no occasion to address that issue." *See* Appellee Br. Clabough, ECF No. 31, 50 (citing Op., R. 112, Page ID #1926). Alternatively, Defendants argue that they had

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

probable cause to arrest Strong because of the excited manner in which Strong emerged from the bathroom stall, "approached and pushed Clabough from behind," and "appeared to reach for Clabough's firearm." Appellee Br. of Clabough, ECF No. 31, 51. We hold that the district court properly granted summary judgment to Defendants on this issue.

### 1.      Constitutional Violation

Officers may briefly detain persons for investigative purposes, but these detentions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Perez*, 440 F.3d 363, 369–70 (6th Cir. 2006) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The detention should "last no longer than is necessary to effectuate the purpose of the stop," and for investigative purposes, officers should use the "least intrusive means reasonably available to verify or dispel [their] suspicion[s] in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). When a seizure exceeds these bounds, it "ripens into an arrest, which must be supported by probable cause." *See Smoak v. Hall*, 460 F.3d 768, 779 (6th Cir. 2006).

As a threshold matter, Plaintiff Strong does not contest the constitutionality of his detention on the bathroom floor, which spanned approximately thirteen-minutes. *See* Appellant Br., ECF No. 28, 35 ("Plaintiffs do not deny the detention was reasonable at its inception."). We agree that Defendants acted reasonably in detaining Strong during this time, considering the gunfire and ongoing emergency in the bathroom. *See Terry v. Ohio*, 392 U.S. 1, 20–22 (1968) (holding that officers may conduct limited seizures when they have reasonable articulable suspicion that a crime has been committed); *see also Michigan v. Summers*, 452 U.S. 692, 702 n.17 (1981) (holding that certain "police conduct may be justified by exigent circumstances in the absence of a warrant"). Rather, Strong's argument focuses on the second phase of his detention, when Defendants

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

transferred him to different KPD officers, who then drove him to the police station and held him there. Because Strong has not alleged facts to support that Defendants were involved in his continued detention past the initial *Terry* stop, we need not resolve the important question of probable cause.

Section 1983 claims must be based on each defendant's own unconstitutional behavior. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (noting that personal liability attaches to the defendant's actions in situations that they personally faced, and not "any problems caused by the errors of others, either defendants or non-defendants."); *Stahl v. Coshocton Cnty.*, 754 F. App'x 335, 343 (6th Cir. 2018) (noting that "damage claims against government officials . . . must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right" (citations omitted)).

In the instant matter, Officer Clabough escorted Strong into the hallway, explained to the sergeant that Strong had been inside the bathroom, and asked, "what do we need to do with [Strong]?" Ex. 11 Clabough Body Cam, R. 45, Page ID #407 at 15:25:30. The sergeant replied that he would get another officer to take Strong. Moments later, the sergeant found an officer and said, "[Strong] needs to go to the third floor." *Id*. at 15:26:01–05. At 3:26 pm, the non-defendant officer took custody of Strong, led him away from Defendants, and outside the school building to a police vehicle. Significantly, the passage of time between Defendants' initial seizure of Strong inside the bathroom, and when non-defendant officers assumed custody of Strong, was only about fourteen minutes. This means that Defendants were only personally liable for events occurring within this fourteen-minute window, prior to Strong's removal from the building.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

But Strong does not argue that Defendants seized him unlawfully during this time frame. Rather, Plaintiff's brief appears to concede that Defendants' actions at the school amounted to a reasonable *Terry* stop, stating that "officers arguably could detain Strong while they secured the scene, [but] they could not constitutionally march him from that scene to a squad car and then to the police station." *See* Appellant Br., ECF No. 28, 35–36. But the video evidence clearly shows that Defendants did not march Strong to a squad car or drive him to the station, and that both acts were committed by another officer not named in this case. Plaintiff Strong has not brought claims against any other individuals who may have been involved in his detention at the police station. Most importantly, Strong has not alleged how Defendants Clabough, Baldwin, Cash, and Willson were personally involved in this detention, and has not proceeded against them on a failure-to-intervene theory or any other basis for relief.[4]

## 2.   Clearly Established

Because Defendants did not personally violate any constitutional right, we need not address the second part of the analysis regarding whether that right was clearly established. *See Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015) (noting that "if the plaintiff cannot make both showings, the officer is entitled to qualified immunity"). We hold that Defendants are entitled to qualified immunity on this issue.

## C.  EXCESSIVE FORCE CLAIM

Plaintiff Robinson argues that Defendants used excessive force against Thompson by "shoving [him] around." *See* Appellant Br., ECF No. 28, 42. To that end, Plaintiff argues that

---

[4] This Court has affirmed the denial of qualified immunity on a plaintiff's failure-to-intervene claim when law enforcement officers failed to intervene to prevent an arrest not supported by probable cause. *Bunkley v. City of Detroit*, 902 F.3d 552, 565–66 (6th Cir. 2018). Because Plaintiff Strong has not brought such a claim, we have no occasion to address it.

- 15 -

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Defendants' conduct was improper because (1) the alleged crime (domestic assault) was minor, (2) Thompson's initial actions did not cause the Officers to perceive a threat, and (3) Thompson did not actively resist arrest. Also noteworthy is Plaintiff's decision to focus her argument on the Officers' use of non-deadly force, while conceding the use of deadly force.[5] In response, Defendants argue that they properly grabbed Thompson's arms during the arrest because Thompson refused to remove his hand from his pockets, which posed a threat to officer safety. We agree with Defendants.

### 1.     Constitutional Violation

The Fourth Amendment prohibits the use of excessive force by officers effecting an arrest, investigatory stop, or other seizure. U.S. Const. amend. IV. Rather, the level of force must be objectively reasonable. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Whether an officer's conduct is reasonable involves weighing the totality of the circumstances, with particular attention to the three *Graham* factors: (1) severity of the crime, (2) threat to officer safety, and (3) active resistance by the suspect. *Id*. When necessary, arresting officers may use force against a noncompliant suspect to bring the situation under control. *See Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014). This is especially true when officers are unsure what a suspect possesses in his pocket. *Id*.

Applying the *Graham* factors to the present matter, the Officers were justified in using some force to secure Thompson. As for the severity of Thompson's alleged crime, we do not view domestic assault as a "minor" offense, because such perpetrators may still "present a heightened

---

[5] In this Court, "an appellant forfeits an argument that [she] fails to raise in [her] opening brief." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019). Although Plaintiff Robinson briefly alludes to the use of deadly force being improper, the thrust of her argument concerns Defendants' actions prior to the shooting. Because Plaintiff does not challenge Officer Clabough's decision to shoot Thompson, we do not consider it on appeal.

- 16 -

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

level of danger to responding officers." *See* Clabough Appellee Br., ECF No. 31, 34 (quoting *Campbell v. Babaoglu*, No. 3:05-cv-360, 2007 WL 2491826, at *6 (E.D. Tenn. Aug. 29, 2007). And while the video shows that Thompson's physique, though not small, was not particularly threatening when weighed against four male officers, Defendants were nonetheless entitled to be apprehensive about Thompson because they did not know whether he was armed. Considering Regina Perkins' statements to Clabough that Thompson "carrie[d] a 9mm" handgun and had used it to threaten her daughter, as well as Officer Willson telling Clabough that Thompson "had a history of fighting in the school," Defendants had reason to perceive a safety threat when Thompson refused to take his hand out of his pocket. Ex. 9 Clabough Selma Video, R. 45, Page ID #405 at 14:18:05–09; Ex. 10 Officer Clabough Interview, R. 45, Page ID #406, at 10:21:44. The third *Graham* factor also lends support to Defendants' use of force. Robinson cites to *Eldridge v. City of Warren* for the proposition that "[n]oncompliance alone does not indicate active resistance; there must be something more." 533 Fed. App'x 529, 535 (6th Cir. 2013). While this is true, that "something more" existed during Thompson's arrest, due to the Officers' reasonable concern that Thompson's pocket held a gun and Thompson's refusal to remove his hand from his pocket, which persisted up until the moment when his gun fired. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (holding that a purposeful act of defiance using one's own body can constitute active resistance). In cases where this Court has found excessive force, "the suspects were compliant or had stopped resisting," as opposed to Thompson's refusal to remove his hand. *Hagans*, 695 F.3d at 509.

Furthermore, the standard for excessive force claims is "objective reasonableness." *Graham*, 490 U.S. at 388. "Not every push or shove, even if it may later seem unnecessary . . . violates the Fourth Amendment." *Id.* at 396 (cleaned up); *see also Hanson v. Madison Cnty.*

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

*Detention Center*, 736 F. App'x 521, 530 (6th Cir. 2018) (noting that the Constitution is not concerned with "a de minimis level of [force]"). The instant video depicts Officers grabbing onto Thompson's arms, and, at most, pulling or bumping against him. Undoubtedly, this Court has permitted more extreme uses of force. One such example involved a plaintiff who walked away from an officer and pulled out their cell phone, in contravention of orders. *See Bolden,* 595 F. App'x at 470. This Court held that the officer did not use excessive force when he responded by smacking the plaintiff's phone out of his hand, throwing him to the ground, and holding him there. *See id*; *see, e.g., Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (holding that an officer made reasonable use of non-deadly force when he took the plaintiff by the arm, removed him from the vehicle, and took him to the ground, after the plaintiff had ignored commands to exit the vehicle and instead reached for the console).

Similarly, Defendants were justified in grabbing Thompson's arms when he refused to follow orders. The Officers did not attempt to tase or otherwise harm Thompson prior to the moment when Thompson's gun fired, even despite Thompson's refusal to remove his hand from his pocket. This is distinguishable from cases such as *Palma v. Johns* and *Landis v. Baker*, where this Court denied qualified immunity to officers who employed a taser gun on suspects who refused to remove their hands from their pockets. *See* 27 F.4th 419, 430 (6th Cir. 2022); 297 F. App'x 453, 456-57 (6th Cir. 2008). Unlike *Palma* and *Landis*, the video footage in the instant case demonstrates that the Officers merely grabbed Thompson's arms when he refused to remove his hand from his pocket, which resulted in some jostling in the moments before Thompson's gun fired. We conclude that this degree of force was ultimately de minimis. *See Hanson*, 736 F. App'x at 530.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Of course, Officer Clabough did more to Thompson than just "shov[e] [him] around." *See* Appellant Br., ECF No. 28, 42. He fatally shot him. But given the circumstances, Plaintiff concedes that the use of deadly force was reasonable:

> While Clabough may have been justified in using force after the officers discover the presence of [Thompson's] gun in his pocket, or even shooting [Thompson] after [Thompson's] gun fired, no one, including Clabough, were justified in participating in following Willson and Baldwin's lead and shoving [Thompson] around.

*See id.* The Supreme Court has held that deadly force is objectively reasonable when there is probable cause to believe that the suspect poses an immediate threat to officer safety or the safety of others. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985). In any event, we need not address the merits of deadly force because Plaintiff has forfeited the issue on appeal.

### 2. Clearly Established

Because Defendants did not violate any constitutional right, we need not address the second part of the analysis regarding whether that right was clearly established. *See Lewis*, 779 F.3d at 412. We hold that Defendants are entitled to qualified immunity on this issue.

### D. WRONGFUL DENIAL OF MEDICAL CARE CLAIM

Robinson argues that Defendants Clabough, Cash, and Baldwin are not entitled to qualified immunity because they ignored Thompson's objectively serious medical needs after he sustained a gunshot wound in the bathroom.[6] Specifically, Plaintiffs allege that the officers sought immediate care for Officer Willson after the shooting but neglected to do so for Thompson. Defendants refute this, alleging that Cash and Baldwin immediately radioed for help. Because of uncertainties created by the video evidence, we hold that Defendants are not entitled to qualified immunity on this issue.

---

[6] Officer Willson was not sued for the denial-of-medical-care claim.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

### 1.    Constitutional Violation

Under the Fourteenth Amendment Due Process Clause, pretrial detainees have a settled right to medical care.  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244–45 (1983) (noting that pretrial detainees are entitled to constitutional protections that are "at least as great" as those available to convicted prisoners under the Eighth Amendment).  This right extends to arrestees or other persons "injured while being apprehended by the police."  *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024) (quoting *City of Revere*, 463 U.S. at 244).

When a suspect becomes injured, a police officer or other government official may sometimes fulfill the duty to provide medical care by immediately summoning help.  *See Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1098 (6th Cir. 1992).  Other times, a prompt call for assistance may not fully discharge their obligations.  This is especially true in cases where the officers engage in activities other than securing the scene and attempting to save the life of the injured suspect, even if they initially summoned help.  *Heeter*, 99 F.4th at 917; *see also Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 601, 600, 603 (6th Cir. 2005) (holding that officers were deliberately indifferent when they engaged in casual conversation and adjusted their uniforms while the injured suspect was "bleeding and appeared unable to breathe").  Officers also may not stand idle while a suspect is in obvious need of emergency care, "even for a few minutes."  *Heeter*, 99 F.4th at 917.  That said, Officers need not "exhaust[] every medical option."  *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 846 (6th Cir. 2018).

To prevail on a constitutional claim for the wrongful denial of medical care, Plaintiff Robinson must show that the Officers acted with deliberate indifference.  *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 315 (6th Cir. 2023).  This standard consists of two prongs, one objective and the other subjective.  *See id*.  Objectively, Plaintiff must demonstrate a medical need that is

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

both obvious and sufficiently serious, such that "anyone would understand it pose[s] a 'substantial risk of serious harm' without medical intervention." *Heeter*, 99 F.4th at 916 (citation omitted). There is no dispute that Thompson's gun-inflicted wound qualifies as a serious injury, as evidenced by his considerable blood loss and eventual death.

In assessing the subjective prong, we ask whether the Officers deliberately *or recklessly* disregarded the serious injury, emphasizing that this Court has modified the subjective prong from knowledge *to recklessness*. *See Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021) (modifying the subjective prong of a pretrial detainee's deliberate indifference claim); *see also Helphenstine*, 60 F.4th at 315–16 (noting that the subjective prong requires something "more than negligence but less than subjective intent"). Thus, we require a showing that the Officers "acted deliberately" and also "recklessly" disregarded "an unjustifiably high risk of harm that [was] either known or so obvious that it should [have been] known." *Helphenstine*, 60 F.4th at 317 (citations omitted). Relatedly, Plaintiffs must prove that the Officers responded to that risk in an unreasonable way. *See Heeter*, 99 F.4th at 916. "There must be a showing of more than mere negligence, but something less than specific intent to harm or knowledge that harm will result is required." *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1970)). Courts are unlikely to second guess medical judgments where the injured party has received at least some treatment. *Id.* However, the treatment received may be "so woefully inadequate as to amount to no treatment at all." *Id.* (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

In the instant matter, video footage confirms that Officer Clabough fired the second gunshot at approximately 3:12:31–32 pm. Within moments of that gunshot, someone called, "10-81 Austin East, 10-81 Austin East" on a radio. *See* Clabough Body Cam, R. 54, Page ID #755 at

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

15:12:49–51.  Officer Cash later clarified that this phrase indicates to dispatch to notify "the Chief of Police, Major Crimes, responding officers, [and] first responders."  Cash Dep., R. 104-1, Page ID #1805.  Officers then proceeded to secure the scene by handcuffing Thompson and Strong, who were both already on the ground.  Approximately one minute after Cash first spoke to dispatch, Officer Baldwin radioed for "two 47's," meaning two ambulances.  *Id*. at Page ID #755 at 15:13:45–47; Clabough Dep., R. 104-2, Page ID #1794.  It is therefore evident that the Officers fulfilled their initial duty to summon help.[7]

However, the video also shows that the Officers did not exclusively spend these few minutes attempting to help Thompson or save his life.  On the contrary, Officer Clabough remained with Plaintiff Strong for most of the incident, although he was already restrained in handcuffs.  Officer Cash knelt over Thompson's body to restrain him for reasons that are not easily explainable, considering that Thompson was bleeding out on the ground.  At another point, Cash stood up and leaned over Thompson's body to wash blood off his hands in the sink.  Later, Officers Baldwin and Clabough bumped fists, seemingly to congratulate each other on surviving the incident, and one of them commented, "He almost killed you."  *See* Ex. 12 Baldwin Body Cam, R. 45, Page ID #408 at 15:17:36.

Concerningly, the video also shows that Thompson went unassisted for at least four minutes while Willson received medical care in the hallway.  Prior to this, the evidence shows that Plaintiff Strong, handcuffed on the ground, shouted multiple times for Officers to assist Thompson.  Officer Cash proceeded to sit on Thompson's wounded body, or kneel closely over it, but did nothing to help him as he bled out on the floor.  Strong continued to scream in the background for the Officers

---

[7] It is unclear from the video footage whether the Officers summoned help for Thompson specifically, but they did make a general request for emergency help.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

to assist Thompson, seemingly to no avail.  Although Cash shouted, "Step it up!" during this time, presumably to paramedics or other officers, he did not personally attempt any aid to Thompson during the almost three-minute period when he hovered over his body.  *See* Ex. 16 Cash Body Cam, R. 45, Page ID #412 at 15:13:43–15:16:13.  When another individual approached Cash and asked what had happened to Thompson, Cash responded, "He shot himself it looks like."  Ex. 16 Cash Body Cam, R. 45, Page ID #412 at 15:14:57.  Finally, at 15:16:31, Cash used a knife to remove Thompson's backpack approximately four minutes after he had been shot.

Meanwhile, the injured Willson was busy receiving care in the hallway, and someone off camera offered him a tourniquet three times.  Although the events in the hallway were not clearly captured by Defendants' body cameras, Willson can be seen accompanied by at least two individuals, presumably paramedics, while Thompson went unattended.  The school nurse finally began attending Thompson approximately five minutes after the initial shooting.  Both parties agree that EMT personnel began treating Thompson between 3:20pm and 3:21pm.

Given these facts, in addition to significant gaps left by the video footage, a jury could conclude that Defendants responded unreasonably to a serious risk of harm.  *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).  Although Defendants clearly summoned help, questions remain as to whether they deliberately or recklessly disregarded an obvious and unjustifiably high risk of harm to Thompson by not doing more to provide basic first aid, and by engaging in other non-urgent activities, however brief, that did not further this goal.  *See Helphenstine*, 60 F.4th at 317; *see also Jones v. City of Cincinnati*, 521 F.3d 555, 557–58 (6th Cir. 2008) (holding that officers were not entitled to qualified immunity when they failed to remove the suspect's handcuffs, which delayed the administration of care, and failed to provide mouth-to-mouth resuscitation or other aid).  Although the Officers were not required to exhaust every medical

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

option to save Thompson's life, they were also not permitted to stand idle, i.e., by attending other matters or sitting on Thompson's bleeding body. These uncertainties and gaps in the video footage must be viewed in the light most favorable to Thompson. With that in mind, Plaintiff has presented a jury question as to whether Defendants deliberately or recklessly disregarded Thompson's objectively serious medical needs. *See Brawner*, 14 F.4th at 598.

### 2.    Clearly Established

We next ask whether it was clearly established in April 2021 that Defendants' actions would violate the Constitution. In 1983, the Supreme Court established that officers must "provide adequate medical care to suspects shot during apprehension." *Heeter*, 99 F.4th at 920 (citing *City of Revere*, 463 U.S. at 244). Still, *Brawner* did not modify the subjective prong of the deliberate indifference standard from actual knowledge to recklessness until September 2021, meaning that the applicable standard for April 2021 requires Plaintiff to show that Defendants knowingly and deliberately disregarded the risk. "Because government officials do not readily admit the subjective component of this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (brackets, citation, and quotation marks omitted).

Since 2005, it has been clearly established that responding officers may not engage in behavior that could be construed as idle, and thus indifferent to a suspect's serious medical needs. *See Est. of Owensby*, 414 F.3d at 603. The video footage demonstrates that while the Officers summoned help, they did not turn their attention to life-saving measures for Thompson and even acted in ways that a jury could perceive as idle or indifferent. With respect to the actions of individual Defendants, Officer Cash sat or knelt over Thompson's body for almost a minute, took a break to wash his hands, and then proceeded to hover over Thompson for another two minutes

- 24 -

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

without rendering any emergency aid.  Officer Clabough declined to attend Thompson entirely, and instead stayed with Plaintiff Strong for the duration of the incident, even after handcuffing Strong and establishing that he was not armed.  It is unclear what Officer Baldwin was doing for most of the incident since his body camera had fallen off, but we know from the other Officers' body camera footage that Baldwin was not attending to Thompson.  After retrieving his camera, however, Officer Baldwin approached Clabough and the two officers bumped fists.

Because a reasonable jury could conclude that the Officers knowingly and deliberately disregarded an unjustifiably high risk of harm to Thompson, and because Thompson's right to medical care was clearly established in 2021, Defendants are not entitled to qualified immunity on Robinson's claim for wrongful denial of medical care.

### E.  CARE AND SOCIETY CLAIM

Plaintiff Robinson argues that Defendants violated her Fourteenth Amendment right to the "care and society" of Anthony.  She alleges that "it is clearly established that an officer may not arrest or remove a child from the custody of his parent without notice or a pre-deprivation hearing unless that officer faces an emergency."  Appellant Br., ECF No. 28, 51. To support this proposition, she cites to various cases concerning the removal of a minor child from their custodial parent's home.  *See Barnett v. Smithwick*, 835 F. App'x 31 (6th Cir. 2020); *Kovacic v. Cuyahoga Cnty Dep't of Children & Family Services*, 724 F.3d 687 (6th Cir. 2013); *Tenenbaum v. Williams*, 193 F.3d 581 (2d Cir. 1999).  Defendants respond that Plaintiff's claim is not cognizable because the aforementioned cases concern the type of situation where a minor child must be removed from their home without a warrant.  We agree with Defendants.  These cases are inapplicable because they do not involve the arrest of a minor child; rather, they deal with child removal in the context of poor living conditions within the home.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

The district court construed Robinson's argument as a familial association claim, which appears to be the closest cognizable claim available. In such §1983 cases, this Court has held that "no constitutional violation of the right to family association exists without a state action directed at the family relationship." *Chambers v. Sanders*, 63 F.4th 1092, 1099 (6th Cir. 2023). In *Chambers*, the children of an incarcerated father pursued a §1983 claim to argue that their father's wrongful conviction and imprisonment had "violated their constitutional right to family integrity." *Id.* at 1095. This Court affirmed the dismissal of this claim because the plaintiffs had not shown that the government official's "conduct was directed at interfering with their parent-child relationship." *Id.* at 1101. There was no culpable state of mind. Because the Officers' arrest of Thompson and failure to attend to his medical needs was not directed at Robinson, this claim fails.

The district court did not reach the "clearly established" prong of the analysis because it found that no constitutional violation occurred. Still, Plaintiff has not shown that Officers violated any clearly established right that would apply in this situation. Therefore, we affirm the district court's grant of summary judgment with respect to Plaintiff Robinson's care and society claim against Defendants because Plaintiff has not shown any purposeful interference with the parent-child relationship or other violation of her own constitutional rights.

## IV.    CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgment of the district court with respect to Plaintiff Robinson's wrongful arrest claim, excessive force claim, and care and society claim, and Plaintiff Strong's wrongful arrest claim; and we **REVERSE** the district court's judgment only with respect to Plaintiff Robinson's denial-of-medical-care claim against Defendants Baldwin, Cash, and Clabough, and **REMAND** that issue for further proceedings consistent with this opinion.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

**NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.**  I agree that the defendants are entitled to qualified immunity on Robinson's wrongful arrest, excessive force, and care and society claims as well as Strong's wrongful arrest claim.  But because I would find the defendants are also entitled to qualified immunity on Robinson's wrongful-denial-of-medical-care claim, I respectfully dissent in part.

Officials are entitled to qualified immunity if either (1) "the official's conduct did not violate a constitutional right" or (2) "that right was not clearly established at the time of the conduct."  *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001)).  A right is clearly established if its "contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  Plaintiffs need not find "a case directly on point," but existing precedent at the time of the conduct must place the constitutional question "beyond debate."  *al-Kidd*, 563 U.S. at 741.  The officers here get qualified immunity under both prongs.

Robinson claims that officers Cash, Clabough, and Baldwin violated Thompson's Fourteenth Amendment rights by ignoring his objectively serious medical needs.  "The Due Process Clause . . . require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police."  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  The officer need not personally give aid to the suspect, but he cannot act with "deliberate indifference to serious medical needs."  *Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017).  In the context of pretrial detainees, we have said a Fourteenth Amendment deliberate-indifference claim has both an objective and a subjective component.  *Brawner v. Scott County*, 14 F.4th 585, 591 (6th Cir. 2021).  Objective

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

indifference requires evidence that the medical need is "sufficiently serious." *Id.* Whereas the subjective component concerns the officer's intent—"something akin to reckless disregard." *Id.* at 596 (internal quotation marks omitted). In this context, recklessness means "[a] defendant must have not only acted deliberately (not accidentally), but also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* (internal quotation marks omitted).

When an officer injures a suspect during an active scene, he need not immediately render aid. *Thomas*, 854 F.3d at 367. But he "cannot prioritize activities unrelated to securing the scene or unnecessary to [his] duties over trying to save the suspect's life." *Id.* (internal quotation marks omitted). And he "cannot unreasonably delay medical treatment." *Id.* We have also said an officer cannot "stand idle . . . even while paramedics [a]re on their way" rather than administer aid he is trained to provide. *Heeter v. Bowers*, 99 F.4th 900, 917 (6th Cir. 2024). Still, an officer "does not act with reckless disregard when he immediately summons help and then focuses on his own safety," the safety of others, or securing the scene. *Thomas*, 854 F.3d at 367; *see also Wilkerson v. City of Akron*, 906 F.3d 477, 483 (6th Cir. 2018) ("When police injure a person while apprehending him, they generally satisfy the Fourteenth Amendment by summoning medical care and not intentionally or recklessly delaying his access to it."). These precedents tell us an officer is deliberately indifferent when he does nothing or engages in idle banter with his colleagues while a suspect is dying. *See Heeter*, 99 F.4th at 917. But when an officer calls for help, secures the scene, or engages in other necessary duties that do not hinder aid from arriving, he is not deliberately indifferent. *Thomas*, 854 F.3d at 367.

In *Wilkerson*, an officer on the scene of a shooting called for medics right after securing the injured suspect. 906 F.3d at 483. Another officer called again moments later and urged the

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

medical team to "step it up." *Id.* (internal quotation marks omitted). Medics were delayed and struggled with the injured suspect's handcuffs, but we concluded the officer did not cause the delay, let alone intentionally cause it. *Id.* So the officers were not deliberately indifferent to the injured suspect's medical needs. *Id.*

The parties do not dispute that Thompson had a serious medical need—he was shot at point blank range and immediately collapsed. *See Est. of Owensby v. City of Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) ("We have little difficulty finding a substantial risk of serious harm to Owensby's health and safety, as evidenced by his death . . . ."). But the officers were not deliberately indifferent to this medical need. The body camera footage makes this clear.

Start with Lieutenant Cash. He called for an ambulance twice within thirty seconds of Thompson being shot. Cash kept Thompson restrained while the scene was still active—Baldwin was removing Willson's injured body, Clabough had just been approached by Strong and was restraining him, and Thompson's loaded gun was on the bathroom floor. Within about two minutes of Thompson being shot and as the immediate chaos calmed, Cash flipped Thompson over to check his injuries. Recognizing the severity of the bleeding, Cash yelled for medical to "step it up" not once, but three times. R.45-16, Stanley Cash Body Camera Video 04-12-2021 ("Cash Body Cam.") 15:14:42–14:44. He then briefly washed blood off his hands before trying to remove Thompson's backpack and ensure nothing was in his pockets. *Id.* at 15:15:19–16:13.

As initial medical aid arrived, Cash tried to get Thompson to talk, checked if he was still breathing, and removed his handcuffs. And then he ensured the ambulances could quickly get to Thompson by ordering school authorities to "clear a path" in and out of the building and "make a hole" in the bathroom for medical when they arrived.

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Cash called for medical aid immediately, just like the officer in *Wilkerson.*  906 F.3d at 483.  And demanded they "step it up" when he recognized the severity of Thompson's injuries.  He did not delay medical aid.  Instead, he affirmatively tried to assist them by prepping both Thompson and the scene for medical's arrival.  To hold that what Cash did is deliberate is to raise the bar on what officers must do to avoid deliberate-indifference violations.  Cash's actions are a far cry from idle banter or inaction in the face of a serious medical need.  His actions align closely with the officers in *Wilkerson* and should entitle him to qualified immunity.

Next, Baldwin.  While Cash secured Thompson and while Clabough secured Strong, Baldwin dragged the injured Officer Willson out the door.  Robinson argues that because Baldwin attended to his fallen officer while Thompson lay injured, he was recklessly indifferent toward Thompson's injuries.  But no such rule exists in our caselaw.  There is no rule against attending to the medical needs of an injured officer, particularly when another officer is aiding the injured suspect and removing the injured officer would help secure the scene.  *See Thomas*, 854 F.3d at 367.  To hold to the contrary imposes a new obligation on officers to disregard the serious medical needs of their colleagues in favor of a suspect who is actively being attended to.  And even if we were to find this new obligation exists, it certainly would not be clearly established.

Baldwin did not only aid his colleague, but he also helped ensure Thompson had the aid he needed.  Baldwin radioed for two ambulances and repeatedly offered a tourniquet to anyone who needed it—either the other officers who were looking after Thompson or the people in the hall looking after Willson.  Unlike Robinson's telling of these events, Baldwin did not *only* offer Willson a tourniquet three times.  Clabough's video shows Baldwin standing in the bathroom doorway before calling out "I have a tourniquet; do you need it?"  R.45-11, Jonathan Clabough Body Camera Video 04-12-2021 ("Clabough Body Cam."), 15:13:45, 15:14:02–14:14.  Even

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

interpreted in the light most favorable to Robinson, Baldwin is offering a tourniquet generally, not just to Willson, and called for *two* ambulances, not just one for Willson.

Later, when only the school nurses were helping Thompson, Baldwin questioned where the ambulances were. He then asked the nurses if they knew CPR and recommended that they "get that going." R.45-16, Cash Body Cam., 15:20:23–20:32. These actions do not show a reckless disregard for Thompson's medical needs nor is Baldwin engaging in idle banter. Rather, they show concern—he called for an ambulance, offered a tourniquet, questioned the delay in the ambulances, and provided advice to medical personnel. This is beyond what we have required in other cases and, at a minimum, is beyond standing idle. *See Thomas*, 854 F.3d at 367; *Heeter*, 99 F.4th at 917.

Finally, Clabough. Throughout the incident, he was busy with another suspect. Recall, Strong had approached Clabough from behind within a second of Clabough shooting Thompson and while Thompson's loaded gun was still on the bathroom floor. While Baldwin cared for Willson, and Cash handled Thompson, Clabough handcuffed Strong. He told Strong an ambulance was on the way and searched Strong's pockets and backpack. As medical aid arrived, he continued to stand over Strong. And he stayed with Strong until he removed Strong from the bathroom roughly thirteen minutes after detaining him.

Clabough is the only officer that did not independently call for an ambulance. But that is immaterial because "it would have been reasonable for him to rely on the calls" by Cash and Baldwin. *See Hicks v. Scott*, 958 F.3d 421, 439 (6th Cir. 2020). And we know he relied on them because when Strong pleaded for someone to help Thompson, Clabough told Strong an ambulance was on the way. Clabough did not need to help Thompson himself "as long as [he] ensure[d] that the medical care needed [wa]s in fact provided." *See Mass. Gen. Hosp.*, 463 U.S. at 245. And anyway, an officer is allowed to prioritize securing the scene and other necessary duties. *Thomas*,

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

854 F.3d at 367. To that end, Clabough handcuffed Strong, searched his pockets, and then searched his backpack. Securing Strong was surely a necessary duty when there was a loaded gun on the floor and Strong had quickly approached Clabough from behind during an active shooting. Because he relied on the other officers' prompt attention to Thompson and was doing necessary tasks to secure the scene, Clabough did not recklessly disregard Thompson's medical needs.

None of these officers "st[ood] idle" or simply "called the paramedics but did[ no]thing else." *Heeter*, 99 F.4th at 917. Instead, they prioritized securing the active scene—removing Willson, searching and securing Strong, and preparing Thompson for aid by removing his backpack and handcuffs and opening space for ambulances to enter. *Thomas*, 854 F.3d at 637.

Robinson argues the officers never requested medical help for Thompson, only for Officer Willson. Appellant Br. at 45. But this is contradicted by the videos. *Latits*, 878 F.3d at 547 (finding when video evidence is involved and the video is "so clear[] that a reasonable jury could view those facts in only one way," the court should view the facts as depicted in the video). Both Cash and Baldwin called for *two* ambulances. Baldwin asked if anyone needed a tourniquet repeatedly, not just if Willson needed one. Cash and Baldwin did not specifically say Thompson's name on the radio, but they did not say Willson's name either. They merely used codes to call an ambulance to the school. R.45-11, Clabough Body Cam., 15:12:45–12:51 (Cash radios for help twice saying: "10-81 at Austin East"); *Id*. at 15:13:45 (Baldwin radios for "two 47s," meaning ambulances). Robinson notes that Cash's call to "[s]tep it up" does not equate to a 911 call. Appellant Br. at 47. But Cash had radioed for an ambulance. And as he said, "step it up," he motioned for medical personnel to come into the bathroom. R.45-16, Cash Body Cam., 15:14:42–14:44. He then started talking to Thompson and preparing him for an ambulance. All of this

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

makes clear that medical care was in fact requested for Thompson and Willson and does not show the officers were deliberately indifferent to Thompson's medical needs.

Robinson also points out that Willson began receiving aid earlier than Thompson. Appellant Br. at 47–48. But this says nothing about whether Cash, Baldwin, or Clabough demonstrated deliberate indifference toward Thompson's medical needs. They did not. That others attended to Willson does not change that Cash, Baldwin, and Clabough provided support to Thompson.

Next, Robinson notes that Cash stepped over Thompson's body to wash his hands and the officers checked in with each other about their own injuries. *Id.* Perhaps in isolation, these actions might suggest that the officers were more concerned with themselves than Thompson. But we view the scene as a whole. Cash washed his hands and then started checking Thompson's injuries, searching his pockets, and preparing him for medical care. So rather than showing Cash's indifference, washing his hands was likely done to prepare to help Thompson. And the officers did not begin discussing the situation or their own injuries with each other until *after* medical personnel came to help Thompson. And even still, Baldwin talked to the medical personnel about what to do next since Thompson was no longer breathing. And Clabough was handling Strong. So their comparatively minor comments about their own health and safety hardly demonstrate a reckless disregard for Thompson's medical needs. For these reasons, I would find the officers did not violate Thompson's constitutional rights.

On the clearly established prong, we have said that it has been established, since 1983, that officers must "provide adequate medical care to suspects shot during apprehension." *Heeter*, 99 F.4th at 920. But this "general proposition" alone "is of little help in determining whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742. More is

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

needed for a right to be clearly established—existing precedent must place the constitutional question "beyond debate." *Id.* at 741. Under that standard, Robinson's claim fails.

Existing caselaw underscores that an officer is not deliberately indifferent to the serious medical needs of a suspect when he "immediately summons help" and does not "unreasonably delay medical treatment." *Thomas*, 854 F.3d at 367; *see also Wilkerson*, 906 F.3d at 483. And officers may secure the scene to ensure their safety. *Thomas*, 854 F.3d at 367. So if Cash, Baldwin, and Clabough violated Thompson's constitutional rights by doing exactly that, which is what happened here, I would find it was not clearly established that these actions were unlawful.

Robinson claims this case is sufficiently like *Estate of Owensby* to put the officers on notice that they needed to do more to help Thompson. 414 F.3d at 603. But in that case the officers "made no attempt to summon or provide any medical care" until after the officers noticed Owensby was not breathing. *Id.* And that was several minutes after the officers beat him. *Id*. at 600. So the officers knew of and disregarded serious medical needs. *Id.* at 603. Likewise, in *Jones v. City of Cincinnati*, we denied qualified immunity when officers stood around a dying detainee for a prolonged time discussing the absence of fire personnel, even though they already noticed he was not breathing. 521 F.3d 555, 560 (6th Cir. 2008).

But here, two officers summoned medical care within two minutes of Thompson being shot. And they were not simply standing idly as Thompson died. As soon as Cash noticed the severity of his injuries, Cash tried to get Thompson to talk, checked if he was still breathing, and removed his handcuffs. Baldwin offered a tourniquet several times. And though he questioned the absence of another ambulance, he followed that statement by suggesting the nurses present give Thompson CPR. So unlike in *Estate of Owensby* and *Jones*, Officers Cash, Clabough, and

No. 24-5159, *Robinson, et al. v. City of Knoxville, Tenn., et al.*

Baldwin took clear and distinct steps to help Thompson within minutes of the shooting.  These cases do not clearly establish that more was required.

 For these reasons, I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-5159

CHANADA ROBINSON, for herself and as next friend and
next of kin for Anthony Thompson, Jr.; GRALYN STRONG,

    Plaintiffs - Appellants,

    v.

CITY OF KNOXVILLE, TENNESSEE dba Knoxville Police
Department; BRIAN BALDWIN, STANLEY CASH,
JONATHON CLABOUGH, and ADAM WILLSON, in their
individual and official capacities,

    Defendants - Appellees.

> **FILED**
> Feb 26, 2025
> KELLY L. STEPHENS, Clerk

Before:  CLAY, WHITE, and NALBANDIAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED IN PART, REVERSED IN PART, and REMANDED to the district court for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____
Kelly L. Stephens, Clerk